**In re GULF PENSION LITIGATION.**

**Civ. A. No. 86–4365.**

United States District Court,
S.D. Texas,
Houston Division.

April 10, 1991.

H. Lee Godfrey, Evelyn Jo Wilson, Susman Godfrey, Houston, Tex., Charles Plenge, Haynes and Boone, Dallas, Tex., L.M. Boeckman, Karen L. Suhre, Hughes & Luce, Dallas, Tex., Ellen M. Doyle, Berger Kapetan Malakoff & Meyers, P.C., Pittsburgh, Pa., for plaintiffs.

Robert Malinak, Autry Ross, Baker & Botts, Houston, Tex., Jeffrey C. Londa, Hutcheson & Grundy, Houston, Tex., for defendants.

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................ 1160
II. PARTIAL TERMINATION CLAIMS ....................................... 1161
 A. General ........................................................ 1161
 B. Vertical Partial Termination ................................... 1163
 1. Significant Number or Percent ............................... 1163
 2. What Number or Percent is Significant? ...................... 1164
 3. How is the Number or Percent Calculated? ................... 1164
 a. Vested or Non–Vested Terminations ...................... 1164
 b. Employees Who Transferred to a Successor Plan ......... 1165
 c. Turnover Rate ........................................ 1166
 d. Time Period .......................................... 1167
 e. The Relevant Number and Percent ...................... 1167
 4. Significant Corporate Event ................................. 1169
 5. The Number and Percent are Significant ..................... 1170
 6. The IRS Determination ...................................... 1170
 C. Horizontal Partial Termination ................................ 1172
III. REMEDY FOR PARTIAL TERMINATION ............................... 1178
 A. The Gulf Pension Plan ......................................... 1179
 B. Remedy Under the Gulf Pension Plan Upon a Partial Termination ...... 1180
 1. Standard of Review ......................................... 1181
 2. The Legally Correct Interpretation .......................... 1182
 a. Uniformity of Construction ............................ 1182
 b. Fair Reading of § 10.A.2 .............................. 1182
 (1) Does § 10.A.2 Apply When the Plan is Overfunded at the Time of a Partial Termination? ............................. 1182
 (2) Does § 18.d of the Chevron Retirement Plan Bar Plaintiffs' Claims to Surplus Gulf Plan Assets? ......................... 1183
 (a) Validity of § 18.d Under ERISA's Exclusive Benefit Rule.... 1184
 (b) Validity of the 1986 Plan Merger Under § 208 of ERISA.... 1185
 (c) Validity of § 18.d Under the A & B Plan, the CRP and the SAP ...... 1185
 (i) The A & B Plan ...................................... 1186
 (ii) The CRP ............................................ 1190
 (iii) The SAP ............................................ 1194
 (3) Can Surplus CRP and SAP Assets be Distributed Under § 10.A.2 Upon a Partial Termination? ......................... 1196
 (4) Consequences of a Fair Reading of § 10.A.2 .................. 1198
 c. Unanticipated Costs .................................. 1198
 3. Abuse of Discretion ........................................ 1198
 a. Internal Consistency .................................. 1198
 b. Relevant Regulations ................................. 1199
 c. Factual Background and Inference of Lack of Good Faith ........ 1199
 d. Conclusion ........................................... 1201
IV. TERMINATION OF THE CRP AND SAP AS WASTING TRUSTS ........ 1201
V. FIDUCIARY CLAIMS ................................................ 1205
 A. Pension Plan Expenses.......................................... 1205
 B. Self–Dealing by Chevron ....................................... 1208
 C. SRAP ......................................................... 1211
 D. AVIS ......................................................... 1212
 E. Defendants' Promises to Set Aside Gulf Plan Assets for Plaintiffs' Benefit ...... 1213
 F. Other Alleged Fiduciary Breaches .............................. 1214
VI. CONCLUSION...................................................... 1214

## OPINION

LAKE, District Judge.

### I. INTRODUCTION

This is a consolidated class action brought by more than 40,000 former participants in the Pension Plan of Gulf Oil Corporation. Defendants are Chevron Corporation, Gulf Oil Corporation, the Chevron Corporation Retirement Plan, the Pension Plan of Gulf Oil Corporation, the Benefits Committee of the Pension Plan of Gulf Oil Corporation and each of its members, and the Pension Committee of the Pension Plan of Gulf Oil Corporation and each of its members.

To understand the case some appreciation of the demise of Gulf Oil Corporation is necessary. On January 1, 1982, Gulf had 29,706 employees covered under the Gulf Pension Plan and was one of the largest integrated oil companies in the United States. Concerned that Gulf's share price did not reflect its true value, Gulf's management began a plan to streamline the company that included substantial reductions in the number of employees. By the end of 1983 Gulf had reduced its work force to 23,054 active Gulf Plan participants, but its share price had still not risen substantially. In January of 1984 Gulf management learned that a hostile tender offer was imminent from a group led by T. Boone Pickens. Gulf sought to interest several other large oil companies, including Chevron Corporation, in a friendly merger to avoid the Pickens' takeover attempt.

In February of 1984 Gulf and Chevron announced a merger, and a merger agreement was signed in March of 1984. For the next year the companies operated independently under a standstill agreement while Gulf divested itself of certain assets required by the FTC and a number of combined Gulf–Chevron working groups determined how to integrate the two companies and their pension and other employee benefit plans. Because Gulf and Chevron were in the same business it became apparent that a number of employees would be redundant in the merged company. Chevron also decided to sell parts of Gulf to help pay the debt it had incurred in making the acquisition. By July 1, 1986, when the Gulf Pension Plan and the Chevron Annuity Plan were merged into the Chevron Retirement Plan, 13,545 former Gulf Pension Plan participants remained on Chevron's payroll. All of the Gulf employees who left between January 1, 1982, and June 30, 1986, were covered by Gulf employee benefit programs, including pension plans.

This action was filed by plaintiffs, Dean Borst, *et al.*, in November 1986. In April of 1987, plaintiffs, Harry Back, *et al.*, filed a similar action in the United States District Court for the Western District of Pennsylvania. On the motion of the defendants, the *Back* action was transferred to this Court and consolidated with the *Borst* action. The Court preliminarily certified the case as a class action on November 9, 1987, and appointed the individual plaintiffs as class representatives. After several hearings, on February 26, 1990, the Court certified the consolidated action under Fed. R.Civ.P. 23(b)(2) and defined the main class as

(1) All participants in the Pension Plan of Gulf Oil Corporation or any predecessor plan (sometimes abbreviated as the "Gulf Plan" or "Plan") who terminated employment for any reason after December 31, 1981, and before July 1, 1986, with Gulf Oil Corporation or its successors or affiliates, or any subsidiaries that had adopted the Gulf Plan ("Gulf").

(2) All Gulf Plan participants who were accruing benefits under the Gulf Plan as of June 30, 1986.

(3) All Gulf Plan participants who terminated Gulf employment prior to January 1, 1982, and who were receiving a pension or entitled to an immediate or deferred pension or a refund of accumulated employee contributions under the Gulf Plan as of June 30, 1986.

(4) All Gulf Plan participants who terminated employment with Gulf prior to January 1, 1982, and after December 31, 1975, who were not entitled to any pension benefit under the Gulf Plan at the time of such termination (other than a refund of accumulated employee contributions) but who, if they had

been reemployed by Gulf as of June 30, 1986, would have been entitled under the ERISA break-in-service rules to credit for prior service under the Gulf Plan.

(5) All spouses, joint annuitants, or other plan beneficiaries of any deceased Gulf Plan participants described in the foregoing categories.

(6) All alternate payees under qualified domestic relations orders of separated or divorced Gulf Plan participants described in the foregoing categories.

The Court also certified a divestiture sub-class defined as

All members of the main class who were offered employment by any of the following purchasers of assets applicable to the operation in which they were employed by Gulf: Sohio/BP ("Sohio"), Cumberland Farms, Champion Energy, or Thermex.

On January 4, 1990, the Court granted defendants' motion to strike plaintiffs' request for a jury trial, and granted defendants' motion to dismiss most of plaintiffs' common law claims as preempted by the Employee Retirement Income Security Act of 1974, 88 Stat. 829, as amended, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"). The parties agree that the Court has jurisdiction over the remaining claims pursuant to § 502(e) and (f) of ERISA, 29 U.S.C. § 1132(e) and (f).

Plaintiffs went to trial seeking relief under ERISA and the language of various benefit plans for four types of wrongs allegedly committed by defendants. First, plaintiffs claimed that defendants' actions resulted in a partial termination of the Gulf Pension Plan and its predecessor plans that entitled plaintiffs to relief provided by ERISA and the Plan. Alternatively, plaintiffs claimed that two of the plans had served their purposes and their trusts should be terminated as "wasting trusts" under common law. Second, former Gulf employees who were transferred to Sohio,

Cumberland Farms, and Champion Energy as a part of divestitures of former Gulf operations in 1985 and 1986 sought early retirement benefits under the Gulf Pension Plan. Third, former Gulf employees who were transferred to Champion Energy, Cumberland Farms, and Thermex incident to divestitures sought benefits under a severance plan that existed from February 1, 1984, to February 1, 1986 (Plan 728). Finally, plaintiffs sought damages for a number of alleged breaches of fiduciary duty during the corporate merger and the integration of the two pension plans.

On November 8, 1990, after hearing 16 days of testimony, the Court ordered the attorneys in charge for the class and defendants and the CEO of Chevron to meet and determine if some or all of the claims could be settled. The following week the parties announced a proposed settlement of the plaintiffs' claims for early retirement benefits and severance benefits under Plan 728. As part of the settlement Chevron also agreed to vest in their accrued benefits under the Gulf Pension Plan all members of the class whose employment with Gulf was terminated between January 1, 1984, and June 30, 1986, without a vested pension benefit, and plaintiffs agreed to dismiss the partial termination claims of former Gulf employees who were terminated between January 1, 1982, and December 31, 1983. After notice to the class, the Court held a hearing on the partial settlement on January 25, 1991, and approved it. The Court will now address the plaintiffs' remaining claims.

## II. PARTIAL TERMINATION CLAIMS

### A. *General*

An understanding of the partial termination claims requires an appreciation of some basic features of pension plans. An employee normally does not have an unconditional right to benefits provided by a defined pension benefit plan[1] until the em-

---

**1.** Unlike a *defined contribution* plan, under which the benefits an employee receives are contingent upon the funds contributed and the investment return on plan assets, in a *defined*

*benefit* plan the plan itself defines the benefits to be paid. If the employer's contribution and investment return are inadequate to fund those

ployee has worked for the employer for some number of years, as determined by the plan. If the employee ends his employment before he completes this period, he forfeits his right to pension plan benefits. If he meets the plan's time-in-employment criteria, he becomes vested with the right to receive some minimum pension benefit, as defined by the plan, even if he should later end his employment.

An employer makes contributions to a defined benefit pension plan based on its estimate of the amount of money needed by the plan to pay for current and future liabilities. For a number of reasons, a plan can achieve a surplus over what is needed to fund current and future liabilities. If a surplus is created and the plan terminates, i.e., ceases to exist, the surplus may revert to the employer if allowed by the plan.

One of the benefits an employer receives by making contributions to a qualified ERISA pension plan is the right to deduct contributions to the plan for federal income tax purposes.[2] As a condition for this favorable tax status, § 401(a)(7) of the Internal Revenue Code (the "Code") provides that "[a] trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part satisfies the requirements of § 411 (relating to minimum vesting standards)." Section 411(d)(3) of the Code, which was added by ERISA, requires that all qualified plans must provide for vesting (i.e., non-forfeitability) of benefits of employees affected by a plan termination or a partial plan termination.[3] The purpose of Code § 411(d)(3) is to prevent the forfeiture of terminated employees' benefits that have not yet vested and to prevent an employer from reaping a windfall by "mak[ing] deductible contribu-

tions on which he would enjoy a tax-free buildup of income, then terminate the plan and have all amounts revert back to him." *Tipton & Kalmbach, Inc. v. Commissioner*, 83 T.C. 154, 160 (1984); *see United Steelworkers of America v. Harris & Sons Steel Co.*, 706 F.2d 1289, 1298 (3d Cir.1983).

■ Unlike a complete termination, a plan continues after a partial termination. The genesis of the partial termination concept was apparently a 1954 article by the IRS's chief pension expert, Isidore Goodman, who explained that "[a]t times, it is easier to devour an object with several bites than it is to attempt to swallow it in one gulp. So it is with a plan which is chopped down little by little until it becomes merely an empty shell." 32 TAXES 48, 53 (January 1954). Two kinds of plan-related activities can result in a partial termination: (1) The number of participants can be reduced, thereby causing the number of non-vested employees who forfeit their pension benefits to be greater than would otherwise be anticipated under actuarial formulas, or (2) future benefit accruals can be reduced, thereby increasing the potential for a reversion of plan assets to the employer upon termination of the plan. Commentators have referred to these two scenarios as "vertical" and "horizontal" partial terminations. Stuart M. Lewis, *Partial Terminations of Qualified Retirement Plans—An Evolving Doctrine*, 13 COMP. PLAN J. (BNA) 223 (1985).

This case involves claims that both types of partial terminations occurred. Even though Chevron agreed, as part of the partial settlement, to vest all plaintiffs who were terminated during the period when plaintiffs now allege that a vertical partial termination occurred (January 1, 1984,

---

benefits, normally the employer must make additional contributions to the plan.

**2.** The Gulf Pension Plan and Chevron Retirement Plan were intended to be ERISA qualified defined benefit pension plans.

**3.** This statute states:

(3) **Termination or partial termination; discontinuance of contributions.**

Notwithstanding the provisions of subsection (a), a trust shall not constitute a qualified

trust under section 401(a) unless the plan of which such trust is a part provides that—
(A) upon its termination or partial termination,

\*　　\*　　\*　　.\*　　\*　　\*

the rights of all affected employees to benefits accrued to the date of such termination, partial termination, or discontinuance, to the extent funded as of such date, or the amounts credited to the employees' accounts, are non-forfeitable.

through June 30, 1986), the Court must nevertheless address plaintiffs' partial termination claims because the remedy for a horizontal partial termination is to vest class members who were employed on July 1, 1986, the date of that alleged partial termination, and because plaintiffs seek relief in addition to vesting if they are successful on their vertical or horizontal partial termination claims.

■ Although an employer may declare whether a partial termination has occurred, that determination is accorded no deference by a court; the question is one of law for the court to decide *de novo. Anderson v. Emergency Medicine Associates,* 860 F.2d 987, 990 (10th Cir.1988). Neither ERISA nor the Internal Revenue Code defines a partial termination. Aside from case law, most of the authority addressing this question is found in Treasury Regulations, IRS revenue rulings, and the IRS Plan Termination Handbook.[4] These sources offer analytical guidelines, but again do not define a partial termination. Although decisions affecting pension plans must conform to a vast array of detailed statutory and regulatory mandates, no precise guidance is provided on whether a change in plan members or benefits results in a partial termination. Instead, these questions are to be answered by a case-specific factual analysis. *See* Treas.Reg. § 1.411(d)–2(b)(1) (1977).

### B. *Vertical Partial Termination*

The vertical partial termination rule is found within the "facts and circumstances" test of Treas.Reg. § 1.411(d)–2(b)(1).

*General rule.* Whether or not a partial termination of a qualified plan occurs (and the time of such event) shall be determined by the Commissioner with regard to all the facts and circumstances in a particular case. *Such facts and circumstances include: the exclusion, by reason of a plan amendment or severance by the employer, of a group of*

*employees who have previously been covered by the plan....* (emphasis added)

Perhaps because this rule gives so little guidance, it has spawned a number of complex issues, few of which have been resolved by controlling authority in this Circuit, and most of which are present in this case. Before addressing the issues, the Court will first describe them.

#### 1. Significant Number or Percent

IRS revenue rulings suggest that an employer-initiated permanent reduction of either a significant number or a significant percent of employees from a plan as part of a major corporate event may constitute a partial termination. Rev.Rul. 81–27, 1981–1 C.B. 228 (termination of 95 of 165 employees in connection with the closing of one of two divisions was a *significant number* that resulted in a partial termination); Rev.Rul. 73–284, 1973–2 C.B. 139 (when 12 of the 15 employees (80%) covered by a qualified plan declined to transfer to a new location and were terminated, a partial termination occurred because a *significant percent* of the employees were excluded from participating in the plan); Rev.Rul. 72–439, 1972–2 C.B. 223 (the *significant percent* test was met when 120 of the plan's 170 participants (71%) became ineligible to participate in future employer contributions).

Although courts have given lip service to the significant number test, they have been reluctant to use this test as a basis for holding that a partial termination has or has not occurred. *See Tipton,* 83 T.C. at 160 n. 5 ("[Since 34% and 51% are significant,] [w]e need not and do not decide whether a partial termination would occur where a significant *number* of participants but not a significant *percent,* are excluded from participation in a plan."); *Ehm v. Phillips Petroleum Co.,* 583 F.Supp. 1113, 1115–16 (D.Kan.1984) (since 415 terminated employees comprised only 2.5% of the plan participants, the court found no partial ter-

---

**4.** Although IRS revenue rulings are generally entitled to deference by a court, the Plan Termination Handbook is of lesser stature. The Court views it as a useful guide to be followed when

its meaning is clear and consistent with more persuasive authority and with the underlying purposes sought to be achieved by the partial termination rules.

mination under the significant percent test and declined to apply the significant number test). No court has found a partial termination under the significant number test.

In this case plaintiffs argue that the loss of approximately 10,000 Gulf Plan participants between January 1, 1984, and June 30, 1986, satisfies both the significant percent and the significant number tests. Plaintiffs concede that the only reported instance in which the significant number test has been used to find a partial termination involved the discontinuance of an employer's business at a particular location with attendant layoffs. Rev.Rul. 81–27, 1981–1 C.B. 228.[5] Neither the Court nor the parties have uncovered any instance in which the significant number test has been applied to a case such as the present one in which a large number of company-wide terminations is alleged to have resulted in a partial termination.[6]

### 2. What Number or Percent is Significant?

■ Problems arise in applying the significant number and the significant percent tests when the facts are not as manifest as those in the cases and revenue rulings cited above. The Internal Revenue Service has stated, and some courts have found persuasive, that an employer-initiated turnover rate in excess of 20% of a plan's participants might be significant if it is coupled with other factors, such as the closing of a plant or division. These authorities state that termination of a lesser percent of plan participants, especially on a company-wide basis, could only be significant if the plaintiffs present evidence of egregious factors such as evasion of pension obligations or

prohibited discrimination in favor of highly compensated employees. *See Weil v. Retirement Plan Administrative Committee of the Terson Co.*, 913 F.2d 1045, 1052 (2d Cir.1990) ("Weil II"); Plan Termination Handbook §§ 252(8), 252(9)(d) and 252(10).[7]

### 3. How is the Number or Percent Calculated?

The significant percent and significant number analyses in this case are further complicated by disagreements concerning:

1. whether terminated vested as well as non-vested employees should be considered in calculating the percent and number;

2. whether employees who transferred to a successor employer, and whose accrued pension benefits were transferred to a successor plan, should be counted;

3. whether defendants should be entitled to exclude from the number of terminations normal turnovers, what turnovers are "normal," and who has the burden of proof of establishing the normal turnover rate; and

4. whether the percent and number of terminations should be calculated on an annual basis, as defendants argue, or whether the percent and number of terminations occurring from a significant corporate event over a two-and-one-half-year period will satisfy the tests, as plaintiffs argue.

Because the number and percent of terminated Gulf employees must first be quantified before their significance can be

---

**5.** Although a number of Gulf operations, including its Pittsburgh headquarters, were closed because of the merger, plaintiffs do not argue that the layoffs resulting from those closures should be evaluated separately to determine if a vertical partial termination occurred under either the significant number or significant percent test.

**6.** In *Weil v. Retirement Plan Administrative Committee for the Terson Co.*, 750 F.2d 10, 12 (2d Cir.1984) ("Weil I"), the Court stated that termination of a significant number of employees in connection with a company-wide reorga-

nization plan event could constitute a partial termination. However, on remand the district court applied only the significant percent test.

**7.** Although an employer's bad motive can lower the percent required, a benign motive will not preclude a finding of a partial termination. In *Tipton*, 83 T.C. at 160, the Court held that reductions in plan participation of 34% and 51% in consecutive years constituted a partial termination even though the reductions were caused by adverse business conditions beyond the employer's control.

judged, the Court will address these issues first.

### a. Vested or Non–Vested Terminations

■ Many of the former Gulf employees who were terminated between January 1, 1984, and June 30, 1986, were vested under the Gulf Pension Plan.[8] Defendants argue that these employees should not be considered in calculating either the percent or number of terminations. The partial termination rule is designed to prevent forfeiture of pension benefits that have not yet vested and to prevent a windfall to the employer through a reversion of money on which the employer has paid no federal income taxes. Including vested terminees does not further the first policy since they forfeit no benefits. Furthermore, Congress has taken a more direct approach to remedy the potential for a tax-free corporate windfall. When a pension plan is terminated, any assets that revert to the employer are not only included in the employer's gross income, they are also subject to an additional excise tax. The Revenue Reconciliation Act of 1990 raised the excise tax on employer reversions from 15% to 20% and imposed a 50% excise tax unless the employer transfers part of the reversion to a replacement plan or provides more favorable benefits.[9] The Court therefore concludes that in applying both the significant percent and the significant number tests, only non-vested terminations are relevant.[10] However, out of an abundance of caution, the Court has calculated terminations both with and without vested terminees and concludes that the differences in percentages and numbers of terminations are not significant enough to affect the outcome of the vertical partial termination claim.

### b. Employees Who Transferred to a Successor Plan

■ In 1985 Gulf sold certain refining and marketing facilities to Sohio, and Chevron sold the merged company's Northeast and Ohio marketing assets to Cumberland Farms. In both divestitures the asset purchase agreements obligated the buyers to establish defined benefit pension plans with terms substantially similar to those of the Gulf Pension Plan. Incident to both divestitures Gulf and Chevron agreed to transfer pension assets in amounts at least equal to the accrued benefits of the transferring employees. Defendants argue that former Gulf employees who transferred to Sohio and Cumberland Farms should not be included as terminees for purposes of the vertical partial termination analysis.

In *Morales v. Pan American Life Ins. Co.*, 718 F.Supp. 1297, 1302 (E.D.La.1989), *aff'd*, 914 F.2d 83 (5th Cir.1990), the employer, PALIC, closed its Medicare Division on December 31, 1984. During the preceding months PALIC transferred 30 of the 159 Medicare Division employees to other jobs in PALIC. In calculating the percentage of employees who were involuntarily terminated, the Court held that "[t]he transferred employees should not be included with the number of employees involuntarily terminated as they remained PALIC employees and Plan participants ..." The Court is persuaded that the reasoning of *Morales* is also applicable to this case.

Although the Sohio and Cumberland Farms transferees did not remain Gulf employees or members of the Gulf Pension Plan, assets from the Gulf Pension Plan sufficient to cover all of the transferred employees' accrued benefits under the Gulf Plan were transferred to the Sohio and

**8.** According to Defendants' Ex. 332, there were 263 vested terminations in 1984, 1,372 in 1985, and 472 in the first six months of 1986.

**9.** Pub.L. No. 101–508 §§ 12001 and 12002 (Nov. 5, 1990); to be codified as 26 U.S.C. § 4980(a) and (d).

**10.** Prior case law and revenue rulings that arguably address this issue are analyzed in *Weil II*, 913 F.2d at 1050–51. In its *amicus* brief to the Second Circuit urging rehearing in *Weil II*, the government, *inter alia*, criticized the Second Circuit for "comparing apples and oranges" in its calculation of the relevant percent by excluding non-vested terminees from the numerator while continuing to include them in the denominator. The Court agrees that including vested terminees only in the denominator results in an artificially low percentage, and for purposes of the significant percent inquiry the Court will exclude vested Gulf Plan terminees from both the numerator and the denominator.

Cumberland Farms' plans. For the reasons discussed above in connection with the vested, non-vested issue, neither of the policies underlying the partial termination rule would be served by including these employees as "affected employees" for purposes of determining whether a vertical partial termination occurred. In fact, to count such employees could deter employers from taking steps to protect employees in similar situations by potentially penalizing an employer whose terminated employees transfer to a successor employer that is obligated to continue the same or similar benefits and to whom plan assets have been transferred. The Court does not believe that either Congress or the IRS intended such a result. *Cf.* IRS Gen.Couns. Mem. 39,824 (August 27, 1990).

### c. *Turnover Rate*

Since one of the purposes of the partial termination rule is to deter employers from terminating non-vested employees, it is generally agreed that in calculating the number or percentage reduction of plan members, only involuntary, employer-initiated, terminations should be considered. *E.g., Anderson,* 860 F.2d at 990. In cases involving relatively few employees it may be possible to resolve this issue by determining the facts surrounding each termination. More often, however, as exemplified by this case, it is not feasible to analyze individual terminations. To address this problem, the IRS Plan Termination Handbook allows an employer to exclude its normal turnover rate in determining whether the reduction in employees is significant. Section 252 provides in part:

(6) ... The facts and circumstances must be considered in each case and may include the extent to which terminated employees are replaced, and the normal turnover rate in a base period. The base period ordinarily should be a set of consecutive plan years (at least two) from which the normal turnover rate can be determined, and should reflect a period of normal business operations rather than one of unusual growth or reduction. Generally, the plan years selected should be those immediately preceding the period in question.

(7) The turnover rate is determined by dividing the employer-initiated terminations by the sum of the total participants at the start of the period and the participants added during the period. Employer-initiated terminations are generally all terminations other than those attributable to death, disability retirements and retirement at normal age. In certain situations, the employer may be able to prove that other terminations were also not employer-initiated.

Defendants seek to exclude from consideration those Gulf employees who retired and terminated voluntarily between January 1, 1984, and June 30, 1986. Since defendants recognize that many of these departures, however labeled in defendants' employment records, may have been prompted by the impending closings or divestitures of Gulf facilities and across-the-board reductions-in-force, defendants have calculated what they contend was Gulf's "normal turnover rate" before the onset of the troubles described at the beginning of this opinion. Using the years 1978–1981 as the base period, Defendants' Ex. 10 purports to calculate a "normal" Gulf turnover rate of 8.59% and a "normal" Gulf retirement rate of 2.43%.

There are several problems with defendants' 8.59% "normal" turnover rate. Although 1978 through 1981 was a period of normal business operations by Gulf, it was also a period when many new employees were hired each year. In contrast, during the period from January 1, 1984, through June 30, 1986, very few new employees were hired by Gulf. From 1978 through 1981 at least 3,500 new employees were hired each year; there were only 1,084 new hires in 1984, 331 in 1985, and 130 during the first six months of 1986. (Defendants' Ex. 11) This distinction lessens the reliability of the 1978–1981 era as a base period. Plaintiffs' actuarial expert, Mr. William A. Dreher, testified that fewer long-term employees are terminated either voluntarily or involuntarily. Thus, when an employer is continuously hiring large numbers of new employees, the turnover

rate will be higher than when the work force is contracting. It is therefore not reasonable to assume that the 1978–1981 turnover rate would have continued in the 1984–1986 era.

Plan Termination Handbook § 252(7) and Examination Tip (4)(a) and case law place the burden on the employer to prove that terminations are voluntary. *See Morales,* 718 F.Supp. at 1302–03. Although defendants tendered a blizzard of numbers, they presented no evidence that the 8.59% normal turnover rate would have continued in the 1984 through 1986 period. Absent such evidence, and considering the dramatic reduction in new hires and the various programs undertaken by Gulf and Chevron to reduce the work force during this period,[11] the Court concludes that defendants have not proved either that there was a normal turnover rate from 1984 through June of 1986, or that the 8.59% rate urged by defendants represents such a rate.

■ The Court will, however, exclude from its calculation of affected employees the 2.43% normal retirement rate reflected on Defendants' Ex. 10. Retirement, unlike termination, is not a function of the rate of new hires. Under the Gulf Pension Plan any employee who had 75 points, which generally meant at least 20 years of employment, could retire. Logically, some retirements would have occurred from 1984 through June of 1986 even if Gulf and Chevron had not introduced new initiatives to reduce the size of the work force, and this rate would be unaffected by the low new-hire rate during this period.

The Court is not persuaded by plaintiffs' argument, based on § 252(7) of the Plan Termination Handbook, that only normal retirement at age 65 should be considered. Section 252(7) states that this is the general rule, but permits proof by the employer to the contrary. The evidence showed that Gulf employees could receive non-discounted early retirement at age 60, and that eligible Gulf employees could and did retire before age 60 with reduced benefits long before the Gulf/Chevron merger. However, since retirements were accelerated by the initiatives of Gulf and Chevron to reduce their work force, the Court will also treat the 2.43% normal retirement rate as a ceiling, and retirements in excess of that rate will be considered to be employer-initiated. In calculating the number of affected employees under the significant number and significant percent tests, the Court will exclude for each year a number of employees equal to the lesser of the actual number of retirements or 2.43% of Gulf Plan participants at the end of the year.

### d. *Time Period*

■ Defendants argue that in determining whether a vertical partial termination occurred the Court should consider only the number of employees excluded within a single plan year. The Court does not find this position to be supported by logic or required by authority. Most reported vertical partial termination rulings and decisions did not involve massive corporate restructuring of the scale implemented by Gulf and Chevron. The facts in those decisions were therefore generally limited to a period of less than a year. There is nothing in the language of the rule itself, however, that requires that a significant corporate event occur within a year, and the ending of a calendar or plan year has no intrinsic relevance in making this evaluation. The IRS guidance found in § 252(7) of the Plan Termination Handbook instructs that "[t]he turnover rate is determined by dividing the employer-initiated terminations by the sum of the total participants at the start of *the period* and the participants added during *the period.*" (emphasis added) Both the IRS, in its Technical Advice Memorandum Concerning The Employee's Retirement Plan of A & P Company, and the Second Circuit in *Weil I,* 750 F.2d at 12, have stated that a series of employer-initiated terminations related to the same event may be considered in determining whether a partial termination has occurred even if those terminations occur over a multi-year period. This Court likewise concludes that, assuming plaintiffs can prove it, a vertical partial termination

---

**11.** These programs are discussed in part II.B.4., *infra.*

may occur from a significant corporate event that manifests itself in employer-initiated terminations occurring over the two-and-one-half-year period urged by plaintiffs.

e. *The Relevant Number and Percent*

For purposes of the significant number test, the relevant number of terminations is the total number of plan members terminated, less: (1) those who were already vested, (2) those who voluntarily retired, including both discounted and undiscounted early retirees and disability retirees, (3) those who transferred to the Sohio and Cumberland Farms successor plans, and (4) those who died. To calculate the relevant percent the Court will divide the number obtained by the formula in the previous sentence by the sum of the non-vested plan participants at the start of each period and the non-vested participants added during that period. Application of these formulas to the facts yields the following chart, which the Court finds to be established by the evidence.

| | 1984 | 1985 | Jan.–June 1986 | Total 2.5 years |
|---|---|---|---|---|
| Total terminations [12] | 2,623 | 6,588 | 1,843 | 10,947 |
| Deductions: | | | | |
| (1) vested terminees [13] | 263 | 1,372 | 472 | |
| (2) retirements [14] | 483 | 531 | 187 | |
| (3) transfers to Sohio & Cumberland Farms [15] | 0 | 967 | 245 | |
| (4) deaths [12] | 52 | 39 | 16 | |
| Total Deductions | 798 | 2,909 | 920 | |
| Total relevant terminations | 1,825 | 3,679 | 923 | 6,427 |
| Non–Vested Members at Beginning of period [16] | 12,688 | 11,034 | 7,520 | |
| New members added [17] | 1,084 | 331 | 130 | 1,545 |
| Total non-vested members | 13,772 | 11,365 | 7,650 | 14,233 |
| Percentage Decrease | 13.3% | 32.4% | 12.1% | 45.2% |

Alternatively, calculating the relevant number and percent by including vested plan participants in both the numerator and the denominator, yields the following chart:

| | 1984 | 1985 | Jan.–June 1986 | Total 2.5 years |
|---|---|---|---|---|
| Total terminations | 2,623 | 6,588 | 1,843 | 10,947 |
| Deductions: | | | | |
| (1) retirements | 483 | 531 | 187 | |
| (2) transfers to Sohio & Cumberland Farms | 0 | 967 | 245 | |
| (3) deaths | 52 | 39 | 16 | |
| Total Deductions | 535 | 1,537 | 448 | |

**12.** Taken from Defendants' Ex. 11.

**13.** Taken from Defendants' Ex. 332.

**14.** Calculated by multiplying the 2.43% normal retirement rate by the number of all plan participants during the period (i.e., total members at the beginning of the year plus new hires), except for 1984, for which all retirements were deducted since the number was less than 2.43%.

**15.** At a January 3, 1991, hearing, the parties agreed that these were the correct numbers of transferred employees.

**16.** These numbers are agreed to by the parties.

**17.** Taken from Defendants' Ex. 11. The Court has assumed, and the parties agree, that all new members were non-vested.

| | 1984 | 1985 | Jan.–June 1986 | Total 2.5 years |
|---|---|---|---|---|
| Total relevant terminations | 2,088 | 5,051 | 1,395 | 8,534 |
| Members at beginning of period [12] | 23,054 | 21,515 | 15,258 | |
| New members added | 1,084 | 331 | 130 | 1,545 |
| Total members [12] | 24,138 | 21,846 | 15,388 | 24,599 |
| Percentage Decrease | 8.65% | 23.12% | 9.06% | 34.7% |

#### 4. Significant Corporate Event

■ The parties differ over the number of significant corporate events that occurred between January 1, 1984, and June 30, 1986. Defendants contend that two distinct corporate events occurred during this period: the merger of Gulf and Chevron in 1984 and 1985, and then a drastic decline in oil prices with resulting layoffs, which began in late 1985 and culminated in 1986. Plaintiffs argue, and the Court finds, that the business decisions by Gulf and Chevron to reduce the work force all resulted in a single corporate event throughout this two-and-one-half-year period.

After the merger between Gulf and Chevron was announced in February 1984, Chevron and Gulf began a series of actions designed to reduce their partially redundant work force.[18] In March of 1984 Gulf suspended hiring new employees. In May of 1984 Chevron announced and implemented a severance plan for involuntary terminations occurring between April 27, 1984, and April 26, 1986. (Plan 728; Plaintiffs' Ex. 289) Later in 1984 Gulf adopted a three-phase Surplus Manpower Reduction Program to reduce merger-related surplus employees. Under the first phase of the program, announced in November 1984, Gulf offered a Voluntary Termination Incentive Program ("VTIP") to provide sever-ance pay to employees working in locations where Chevron and Gulf had identified a surplus in their work forces. Under VTIP employees were required to come forward during November and December 1984 and volunteer to terminate their employment. Gulf and Chevron required these employees to remain on the job, however, until they were finally released, and most actual VTIP terminations did not occur until the end of 1985. In the second phase of the program Gulf employees were offered transfers or demotions, and were paid severance if they chose not to accept. The third phase involved involuntary terminations. By late November of 1985 this three-phase program had resulted in 4,468 terminations: 923 by voluntary severance, 1,486 by "transfer/demote severance," and 2,059 by involuntary severance. (Plaintiffs' Ex. 484 at p. 3)

At the same time, and also as a result of the merger, Chevron began selling off various assets of Gulf and Chevron, both to reduce redundancies and to finance the enormous debt it had incurred to acquire Gulf. These divestitures, which eliminated thousands of additional Gulf employees, included the sale of Gulf's explosives group to Thermex, the sale of Gulf Oil Trading Company to GOTCO N.V., the sale of the Cedar Bayou polypropylene plant to Amoco Chemicals, the donation of the Harmarville

18. Although the merger-related terminations did not commence until February, all parties have used January 1, 1984, as the demarcation point between pre-merger terminations initiated by Gulf and merger-related terminations in which Chevron was a motivating force. Defendants have never sought to exclude January of 1984 from their calculations of the relevant numbers and percentages during the 1984–1986 era. (See, e.g., Defendants' Exs. 11, 331, and 332.)

Likewise, as part of the partial settlement, defendants have vested employees who were terminated in 1984 before the merger. Since all parties have sanctioned the inclusion of January 1984 terminations, and since the inclusion of these terminations benefits the class, the Court has not disturbed this boundary, albeit somewhat artificial, between the 1982 and 1983 Gulf terminations and the 1984–1986 merger-related terminations.

Research Center to the University of Pittsburgh, the shut-down and sale of the Gulf headquarters building in Pittsburgh, and a number of other divestitures, including those to Sohio and Cumberland Farms discussed above.[19] Although the various employee reduction programs and divestitures were initiated in 1984 and 1985, some of the affected employees were not actually terminated until the first half of 1986. For example, the shut-down of Gulf's Harmarville Research Center and its Pittsburgh headquarters occurred in gradual increments during this two-and-a-half-year period.

Chevron argues that in 1986 additional terminations occurred because of the steep decline in oil prices that began in late 1985 and that these terminations were not merger-related and should not be included as part of any "merger-related" significant corporate event. The evidence shows that Chevron's response to the decline in oil prices was to formulate, in the spring of 1986, a new retirement enhancement program known as the Special Retirement Allowance Program ("SRAP").[20] However, this program was not even announced to employees until June 1986, and the program did not begin until July 1986. (Plaintiffs' Ex. 865) The Court finds that none of the employee terminations that occurred during the first six months of 1986 were due to the decline in oil prices that occurred during that era. Instead, the Court finds that those terminations were the vestigial effects of merger-related actions—both across-the-board reductions-in-force and the divestitures—that began in 1984 and

1985.[21] The Court finds that all of the terminations between January 1, 1984, and June 30, 1986, that are reflected in the charts above were part of a single, significant, merger-related corporate event.

### 5. The Number and Percent are Significant

■ There were 6,427 employer-initiated terminations of non-vested Gulf employees during the single, merger-related, significant corporate event that occurred between January 1, 1984, and June 30, 1986. This represented a 45.2% reduction in the total number of non-vested Plan participants during the period. The Court finds that this number and this percent, and the 8,534 terminations and 34.7% decrease under the alternative analysis, are significant and resulted in a partial termination of the Gulf Pension Plan under both the significant number and the significant percent tests. The Court is led to the conclusion by the magnitude of this reduction in plan membership, by the fact that when these reductions were occurring defendants were planning to reduce the benefits available to those Gulf employees who remained,[22] and by the increased potential for a reversion because of these terminations,[23] which occurred in an atmosphere in which Chevron was considering how to revert surplus Gulf Plan assets for its general corporate use.[24] *See* Plan Termination Handbook § 252(4), (8)(a), and (10).

### 6. The IRS Determination

■ Defendants argue that the Court should show deference to a determination

---

19. The parties agree that all of these divestitures were merger-related except the Thermex divestiture and sale of the Cedar Bayou polypropylene plant to Amoco, which defendants argue had been planned prior to the merger. The Court finds that the Thermex and Cedar Bayou divestitures were carried out as part of the general restructuring incident to the merger and were therefore part of the merger-related corporate event beginning in 1984.

20. SRAP is discussed in greater detail in part V.C., *infra*.

21. Although Chevron presented testimony that the merger-related terminations were largely completed by January 1986, the weight of the

credible evidence, both from a number of former Gulf employees whose merger-related terminations did not actually occur until after January 1986, and through documentary evidence, was to the contrary.

22. See part II.C., *infra*.

23. Although defendants have reduced the size of any potential reversion by agreeing to vest all non-vested employees terminated during this period, the Court's analysis is based on the contemporaneous facts, not those produced from four years of subsequent litigation.

24. See part III.B.3.c., *infra*.

by the IRS that no partial terminations of the Gulf Pension Plan occurred. Months after this action was filed, Chevron, on the advice of its trial counsel, requested its San Francisco counsel, Pillsbury, Madison and Sutro ("PM & S"), to seek a determination from the San Francisco Regional Office of the IRS that a partial termination of the Gulf Pension Plan had not occurred. On May 1, 1987, PM & S submitted a letter accompanied by an IRS Form 5300 seeking a determination that the new Chevron Retirement Plan was a qualified plan under ERISA. Although IRS Form 5300 contains a box to check if a plan sponsor requests a determination on the issue of partial termination, Chevron did not check this box (Defendants' Ex. 18 at p. 6, line 3.a.(iv)), and PM & S' letter neither requested a determination on the partial termination issue nor submitted any information regarding this issue. In a separate cover letter that accompanied the May 1, 1987, request, PM & S referred to this lawsuit and requested expedited treatment of the application for determination. (Defendants' Ex. 18 at p. 1) As required by IRS procedures, Chevron gave notice of the May 1, 1987, request to Gulf Plan participants who were still on its payroll and to certain collective bargaining representatives, but gave no notice to former employees who were members of the then alleged class in this action. Since the request did not seek a determination on the partial termination issue, the notice made no mention of that issue. (Defendants' Ex. 17)

On September 2, 1987, PM & S received questions from the IRS regarding the determination request, which PM & S labeled as "very limited and quite innocuous." (Defendants' Ex. 15 at pp. 2 and 3) In a September 2, 1987, letter to Chevron, PM & S stated that in addition to the information sought by the IRS, Chevron's submission "will also include a request that the Service make a determination that there was no partial termination of the Gulf Plan during the years at issue in the *Borst* litigation.

Generally speaking, reviewers like to move active cases along very quickly, so we should receive a prompt response to this filing." (Defendants' Ex. 15 at p. 1)

True to its word, on October 5, 1987, PM & S hand-delivered to the IRS District Director in San Francisco a letter responding to the IRS' questions. (Defendants' Ex. 16) In one paragraph, comprising a third of a page, PM & S also requested a determination that there was no partial termination of the Gulf Pension Plan during the years 1982 through June 30, 1986.[25] (*Id.* at p. 5.) Attached to the letter were three pages of Chevron calculations showing the percentage reductions. Neither the letter nor accompanying calculations provided any discussion of the events surrounding the numbers presented. PM & S did not notify either present or past members of the Gulf Pension Plan or class counsel in this action of this "modification" of its determination request. Although the head of the PM & S Employee Benefits and Deferred Compensation section admitted that if the partial termination determination request contained in the October 5, 1987, letter had been considered as a separate determination request, a separate notice to interested parties would have been required under IRS regulations, she opined that no notice was required of the October 5, 1987, letter because the request was included in a response for information requested by the IRS. On December 9, 1987, the IRS District Director in San Francisco issued a favorable determination to Chevron. (Defendants' Ex. 19) The determination is one page in length, contains no analysis of issues to which this Court has devoted over 20 pages, and appears to be largely a form letter.

ERISA requires notice to interested parties each time the sponsor of a tax qualified plan requests an IRS determination letter. § 3001(a) of ERISA, 29 U.S.C. § 1201(a). The notice to interested parties must specify procedures by which interested parties

---

25. The partial termination determination request was limited by its language to plaintiffs' vertical partial claim. Barbara Creed, the head of the PM & S Employee Benefits and Deferred Compensation section, who was in charge of this effort, testified that Chevron never sought an IRS ruling on the horizontal partial termination issue.

(generally participants in the plan and their collective bargaining agents) can obtain copies of the materials filed with the IRS, and can file written comments with the IRS, or request the Department of Labor to file comments with the IRS. Rev.Proc. 80–30, 1980–1 C.B. 685, §§ 6 and 7. The notice to interested parties must also indicate the subject matter of the determination letter request. *Id.* at § 7.03(4). In the case of a plan termination, including a partial plan termination, former as well as current employees are interested parties who must receive notice. *Id.* at §§ 3.01(4) and 6.01; Treas.Reg. § 1.7476–1(b)(5) (1976). The purpose of these notice requirements is to afford parties who may have views different from the plan sponsor to make those views known to the IRS before it makes a determination.

Chevron's failure to notify any Gulf Pension Plan participants that it was seeking a determination of the vertical partial termination issue was contrary to the IRS regulations and the underlying policy requiring notice. This failure also violates fundamental fairness and the reasonable claims procedure requirements of § 503 of ERISA, 29 U.S.C. § 1133. Apart from the serious procedural defect in the way Chevron obtained the IRS determination letter, the Court also finds that the IRS determination is due no deference because it evidences no investigation or legal analysis of the facts by the IRS. For both reasons the Court concludes that the IRS determination letter is entitled to no weight, and the Court has given it none.[26]

### C. *Horizontal Partial Termination*

The horizontal partial termination rule is found in Treas.Reg. § 1.411(d)–2(b)(2).

*Special rule.* If a defined benefit plan ceases or decreases future benefit accruals under the plan, a partial termination shall be deemed to occur if, as a result of such cessation or decrease, a potential reversion to the employer, or employers, maintaining the plan (determined as of the date such cessation or decrease is adopted) is created or increased. If no such reversion is created or increased, a partial termination shall be deemed not to occur by reason of such cessation or decrease.

The rule has two elements: a cessation or decrease in future benefit accruals in a defined benefit plan and a resultant creation or increase of a potential reversion to the employer. The rule does not require that an employer actually attempt to achieve a reversion, only that a *potential* for reversion exist because of a cessation or decrease of future benefit accruals.[27]

The partial termination claim arises because of changes in the benefits that were available to former Gulf employees under the Gulf Pension Plan and those available to them after the Gulf Pension Plan and the Chevron Annuity Plan were merged into the new Chevron Retirement Plan effective July 1, 1986. Plaintiffs argue that the effect of the plan merger was to reduce substantially future benefit accruals to former Gulf employees, thereby increasing the potential for a reversion to Chevron upon any final termination of the merged plan.

As evidence of this decrease in future benefit accruals, plaintiffs cite a September 25, 1985, presentation to the Chevron Executive Committee analyzing the prospective plan merger. (Defendants' Ex. 353) The presentation projected that the Chevron Retirement Plan would achieve a decrease

---

**26.** To its credit the IRS recently advised PM & S that it is reconsidering the determination letter because of Chevron's failure to notify all interested parties. (Plaintiffs' Ex. 1269) In its notice to Chevron of reconsideration the IRS stated that "[i]f all interested parties were not notified then ... no reliance could be placed on [the] letter and recision would be retroactive." *Id.*

**27.** Defendants argue that under the literal wording of this regulation any reduction by an employer in future benefit accruals, no matter how *de minimis*, could result in a partial termination. Such a situation is not before the Court, however, because, as discussed *infra*, the reductions in issue were at least $80 million and, far from being *de minimis*, would satisfy defendants' proposed requirement, based on § 320(1) of the IRS Plan Termination Handbook, that a "substantial decrease of participants' benefit accruals [occur]."

of $102 million in present value liability through net decreases in benefits that would otherwise have been paid to former Gulf employees under the Gulf Pension Plan.[28] (A $162 million increase in present value liability was projected for improved benefits to former Chevron employees under the merged plan.)

Another schedule presented to the Executive Committee at the same presentation (Plaintiffs' Ex. 529) showed that this $102 million decrease was achieved because the increase in the present value of the more favorable lump-sum death benefits to former Gulf employees under the merged plan (+ $30 million) was more than offset by four other changes:

(1) undiscounted retirement at age 60 under the Gulf Plan was ended, thus eliminating future accruals of this benefit for service after the July 1, 1986, Plan amendment (−$17 million);

(2) the immediate payment of disability retirement benefits to employees with at least 15 years of service under the Gulf Plan based on the level of compensation and years of service to the date of disability without any early retirement discount was eliminated and substituted with an actuarially discounted benefit (−$65 million);

(3) the 40% post-retirement spousal annuity was frozen, thereby eliminating future accruals of this benefit for service after the July 1, 1986, plan amendment (−$31 million); and

(4) the pre-Social Security "bridge" benefits provided for Plan members whose early or disability retirement benefit began before age 62 was restricted to service up to the July 1, 1986, Plan amendment, thus eliminating future accruals of this benefit (−$19 million).

Analyzing the same changes in pension plan benefits, plaintiffs' actuarial expert, William A. Dreher, independently calculated a reduction in pension liability of $118,-563,000. (Plaintiffs' Ex. 1255 at p. 14) After considering improvements in SRAP benefits to former Gulf employees under the Chevron Retirement Plan, Dreher testified that the net reduction in future benefit accruals to former Gulf employees was $83,803,000.[29] (Plaintiffs' Ex. 1254, column 4.b) Dreher testified that on June 30, 1986, the Gulf Pension Plan had fully funded all past and future benefit accruals for present employees and was overfunded on an ongoing Plan basis by $125 million. According to Dreher, the net effect of the Gulf Pension Plan changes enacted by Chevron was to increase substantially the already overfunded status of the Plan, thereby also increasing the amount of any reversion to Chevron were the Chevron Retirement Plan terminated, or, in any event, allowing Chevron to delay the amount or timing of further contributions to the merged plan.

Defendants mount both factual and legal defenses against the alleged horizontal partial termination. At trial Chevron witnesses Neil Darling, who in 1985 was responsible for financial affairs of all Chevron pension plans, and Alex Ross, who was then manager of the Chevron corporate benefits staff, attempted to deflate the size of the $102 million projected decrease and to disavow its importance in several ways. First, Darling sponsored a chart designed to show that the $102 million estimated decrease was inaccurate by $59 million and that the correct estimated decrease was only $43 million. (Defendants' Ex. 348) When other non-pension plan benefits available under the Chevron Profit Sharing/Savings Plan were also considered,

28. When adjusted to take into consideration the smaller number of Gulf employees actually employed on the date of the plan merger, this decrease was $94.9 million. Because most of the evidence presented by both sides focused on the $102 million decrease, the Court will generally refer to this figure.

29. The difference between Dreher's net number and defendants' September 25, 1985, calculations occurs primarily because Dreher differed on the method of calculating the decrease in future accruals of disability benefits and the increase in future accruals of lump-sum death benefits. The Court finds Dreher's method of calculation and resulting numbers to be more reliable.

Darling's chart purported to show that the present value of future benefits to former Gulf employees under the Chevron Retirement Plan actually increased by $32.5 million.

Ross reiterated Darling's contentions and testified that the $102 million decrease was not intended to represent a reduction in benefit accruals to Gulf Plan members. He also testified that because of a recently discovered oversight, the −$102 million figure was unreliable because it failed to include more favorable benefits under the Chevron Annuity Plan which, although carried forward into the merged Chevron Retirement Plan, were not considered in the 1985 presentation to the Executive Committee or in other contemporaneous Chevron documents.

■ The Court is not persuaded by Chevron's attempt at trial to disassociate itself with figures developed over a number of months and presented by the manager of its corporate benefits staff to the Chevron Executive Committee at the conclusion of extensive planning by Chevron to evaluate the cost and method of merging the Gulf Pension Plan and Chevron Annuity Plan. The Court does not find Defendants' Ex. 348 to be relevant because some of the offsetting adjustments used to moderate the $102 million decrease to a $43 million decrease, e.g., replacement of lump-sum death benefits with life insurance coverage and replacement of disability retirement benefits with a company-paid, long-term disability insurance plan, do not affect the liability of the Gulf Pension Plan or the Chevron Retirement Plan. Although these changes and the others discussed in the next two paragraphs may be relevant to the general effect of the plan merger on former Gulf employees, they are not relevant in determining whether there was a decrease in the present value of Gulf pension plan liability, which is the issue represented in defendants' 1985 documents (Plaintiffs' Ex. 529; Defendants' Ex. 353), or whether there was a decrease in future benefit accruals under the Chevron Retirement Plan within the meaning of the horizontal partial termination rule, Treas.Reg. § 1.411(d)–2(b)(2).[30] For the same reason the alleged benefit that former Gulf employees now receive under the Chevron Profit Sharing/Savings Plan, which Chevron argues resulted in an increase in Chevron's liability by $32.5 million, is irrelevant in considering a possible horizontal partial termination of the Gulf Pension Plan.[31]

■ Nor is the Court persuaded by Ross' testimony that improved benefits to former Gulf employees under the Chevron Retirement Plan should be considered as offsetting any possible effect of the $102 million decrease presented to the Chevron Executive Committee. Defendants' Ex. 363 lists these additional improvements, some of which are also quantified in Defendants' Ex. 348. Some of these improvements, such as the ability of a former Gulf employee to retire from Chevron and elect a lump-sum payment instead of an annuity, were not considered to be plan benefits during the plan merger discussions because of their optional nature. (Plaintiffs' Ex. 212, October 17, 1985, Memo from Carter to Ross) There was even disagreement on the witness stand between Darling, who thought this option was not a benefit, and

**30.** Before the enactment of ERISA in 1974, IRS regulations allowed an employer to avoid a partial termination of a pension plan by instituting a separate "comparable" pension plan. Treas. Reg. § 1.401–6(b)(1) (1963). Even under those rules, which do not apply to this case [see Plan Termination Handbook § 252(12)], a partial termination could be avoided only by replacing the partially terminated plan with a comparable, tax-qualified retirement plan, which in the case of a pension plan, could only be another pension plan unless the IRS specifically approved another comparable plan. (Treas.Reg. § 1.401–6(b)(1) defined a "comparable" replacement plan by reference to Treas.Reg. § 1.381(c)(11)–1(d)(4), which provided that only a pension plan would be considered comparable to another pension plan.)

**31.** Apart from the legal differences between a pension plan and a profit sharing plan, Chevron's documents and witnesses acknowledged that unlike a defined benefit pension plan, there are market risks inherent in a profit-sharing plan. E.g., Plaintiffs' Ex. 136, September 3, 1985, memorandum from Chevron Comptroller G.K. Carter to Louis Fernandez, Jr., Vice–President of Human Resources, at paragraph 3.

Ross, who now thinks it is. Both witnesses agreed, however, that it would be very difficult to quantify the effect of this alleged benefit because a former Gulf employee who elected a lump-sum pension payment option would lose the benefit of the 40% annuity his spouse would otherwise be entitled to receive (a benefit based on the employee's *past* as well as future service) and would likewise lose the benefit of any future AVIS pension enhancements that Chevron might declare.

Ross attempted to demonstrate the effect of five of the plan improvements listed in Defendants' Ex. 363 (and to refute Dreher's testimony) through exhibits showing the effect of the alleged Chevron improvements on five categories of former Gulf employees: Case A—Terminated Vested Benefits, Case B—Disability Benefits, Case C—Death Benefits, Case D—Early Retirement Benefits, and Case E—a different Early Retirement Benefit scenario. (Defendants' Exs. 361 and 362) Ross admitted, however, that if non-pension welfare benefits and benefits under the Chevron Profit Sharing/Savings Plan were not considered, and the focus was limited solely to improved pension benefits under the Chevron Retirement Plan, former Gulf employees who fell within Cases D and E would be better off under the Gulf Pension Plan. He also admitted that under that scenario it would not be possible to make an accurate comparison of benefits under the two plans for Cases A and B and that only under Case C—Death Benefits, would former Gulf employees be better off under the Chevron Retirement Plan. Ross acknowledged that very few employees would fall under Case C and, more importantly, he testified that none of the five cases compared normal retirement benefits under the two pension plans.

The most important factor in the Court's analysis of defendants' factual defense, however, is that Chevron's exhibits and supporting testimony are all admitted after-thoughts developed in the course of this litigation. Chevron documents from 1985 show that Ross and Darling then believed and told the Chevron Executive Committee that the new Chevron Retirement Plan would create a decrease of $102 million in the present value of benefits otherwise payable under the Gulf Pension Plan. Chevron's litigation position that this 1985 estimate was unreliable because of an oversight in the way it was calculated, or its failure to also address non-pension benefits or additional benefits under the Chevron Retirement Plan, does not ring true.

There was abundant evidence besides the documents prepared for the September 25, 1985, Executive Committee presentation that Chevron anticipated and planned for a reduction in Gulf pension benefits. In an August 8, 1985, memo to Ross (Plaintiffs' Ex. 190), Carter stated that "Gulf participant liability has been reduced $205.2 million while Chevron participant liability has increased $176.7. This reflects the deliberalization of some Gulf Plan provisions ..." The plan design described in this memo went through several modifications, e.g., Plaintiffs' Ex. 138, September 9, 1985, memo from Carter to Ross, and ultimately resulted in the benefit structure that achieved the $102 million reduction presented to the Executive Committee on September 25, 1985.

The March 5, 1984, corporate merger agreement between Gulf and Chevron limited to two years Chevron's obligation to continue pension benefits to former Gulf employees at the pre-merger level. (Plaintiffs' Ex. 497 at § 6.10) On July 1, 1986, less than three months after the expiration of this two-year period, Chevron merged the Gulf Pension Plan and the Chevron Annuity Plan into the Chevron Retirement Plan, and reduced benefits to former Gulf employees. Section 204(h)(1) of ERISA, 29 U.S.C. § 1054(h)(1), requires a plan administrator to give plan members written notice of any plan amendment that provides "for a significant reduction in the rate of future benefit accrual[s]." In June of 1986, shortly before the plan merger, Chevron filed a notice under § 204(h)(1) articulating seven ways in which the July 1, 1986, amendments to the Gulf Pension Plan resulted in such reductions of benefit accruals. (Plaintiffs' Ex. 552) Four of the reductions listed were those quantified in

arriving at the $102 million decrease shown on Plaintiffs' Ex. 529.[32]

In assessing defendants' factual defenses to plaintiffs' horizontal partial termination claim, the Court finds that defendants' contemporaneous belief, not a position developed for trial, is most probative of the truth. The contemporaneous evidence establishes that when Chevron was planning to merge the two plans it consistently considered reducing benefits available under the Gulf Pension Plan and ultimately concluded that these reductions would result in a $102 million decrease in Chevron's pension plan liability to former Gulf employees.

 Defendants also argue that the Gulf Pension Plan changes quantified in Plaintiffs' Ex. 529, and in particular the change in disability retirement benefits, cannot be considered in determining if a horizontal partial termination occurred because the horizontal partial termination rule only protects "accrued benefits," and these four categories of reduced benefits are "non-accrued," or "ancillary benefits." This argument is premised upon the contention that the term "benefit accruals" in the rule refers to the rate at which an employee earns an "accrued benefit," which is defined, in the case of a defined benefit plan, by Code § 411(a)(7)(A)(i) as "the employee's accrued benefit determined under the plan and ... expressed in the form of an annual benefit commencing

at normal retirement age...." According to defendants, none of the four benefits that were reduced meet this definition because they did not have a specified accrual rate and did not commence at normal retirement age.[33]

The crux of defendants' argument is that because Code § 411 "protects only accrued benefits" (Defendants' Post–Trial Brief Regarding Horizontal and Vertical Partial Termination at p. 3), the horizontal partial termination rule adopted to implement this section of the Code must also be limited in scope to protecting future accruals of accrued benefits. Defendants argue that the rule does not prohibit an employer from prospectively eliminating or reducing ancillary benefits.

The Court is not persuaded by this argument for several reasons. Defendants have cited no authority, and the Court has found none, that would so circumscribe Code § 411 or the horizontal partial termination rule. Although § 411 is indeed full of references to "accrued benefits," the only reference in § 411(d)(3) to benefits, whether accrued or otherwise, occurs in addressing the remedy for a plan termination. Section 411(d)(3) provides that if a termination or partial termination has occurred, the remedy is to vest "all affected employees to benefits accrued to the date of such ... partial termination ... to the extent funded as of such date...." Given the repeated use of the term "accrued ben-

---

**32.** The introduction to the notice stated that the notice did not include the changes in the restructured pension plan that provided for "a significant increase in the rate of future benefit accruals." Only one pension plan change that arguably benefited Gulf Plan participants was mentioned in the notice. *Id.* at p. 3, paragraph 9. Moreover, as discussed above, even after giving defendants the benefit of the other improved pension plan benefits that were quantified at trial, there remained a significant net decrease in benefit accruals.

**33.** The principal impediment to satisfying the "accrued benefit" definition is that these benefits do not commence at normal retirement age. All of them can be expressed in the form of an annual benefit, and they all accrued, or grew, with an employee's additional service and salary increases. Although the rate of such growth may not have been as predictable as a regular

pension benefit, the right to receive these benefits nevertheless "accrued" under the Gulf Plan in the sense that a Gulf employee or spouse's right to receive them, or to receive them in a greater amount, was enhanced as the employee worked longer and achieved a higher salary. Chevron was not hesitant, either when planning for the plan merger or through its trial witnesses, Darling and Ross, to calculate, based upon actuarially sound principles, the present value of the decreases in funding obligations that would result from eliminating future accruals of these benefits. Also, while "accrued benefits" do not normally encompass ancillary benefits such as disability benefits, *see* § 3(23) of ERISA, 29 U.S.C. § 1002(23), and Code § 411(a)(7)(A)(i), a pension plan *may* provide such ancillary benefits, and when it does, they must be taken into account in funding the plan. Code § 412(*l*)(7).

efits" in parts of § 411 other than § 411(d)(3), the Court does not conclude that the failure of § 411(d)(3) to define a partial termination by reference to a particular type of benefit, and the failure of Treas.Reg. § 1.411(d)–2(b)(2) to speak in terms of a plan amendment that decreases future accruals of "accrued benefits," were drafting oversights.

Section 252 of the Plan Termination Handbook is also inconsistent with such a limited reading of the horizontal partial termination rule. It states:

> (2) The regulations under IRC 411 do not refer to the curtailment concept[34] as determinative of whether there has been a partial termination. Therefore, *when benefits* or employer contributions *are reduced* or the eligibility or vesting requirements under the plan are made more restrictive, facts and circumstances, other than the mere fact that *benefits*, employer contributions, etc. have been cut back, enter into the determination of whether there has been a partial termination....

> (3) I.T.Regs. 1.411(d)–2(b)(2) sets forth a "special rule" for defined benefit plans which cease *future accruals*. In such a case, a partial termination shall be deemed to occur if, as a result of such cessation or decrease, a potential reversion to the employer is created or increased. If no such potential for reversion is created or increased, a partial termination shall not be deemed to occur solely by reason of the cessation or decrease.... (emphasis added)

Section 22.5 of the IRS Training Program, which deals with Employee Plans, also focuses on future benefit accruals, not curtailment of accrued benefits.

The Court concludes that the horizontal partial termination rule, although not a model of clarity, is intended to deter employers from adopting plan amendments that lessen accruals of future benefits, including ancillary benefits, if the effect of such an amendment would be to create or

increase the likelihood that the employer would receive a reversion of plan assets in the future. This is a broader goal than the other provisions of § 411, which protect already accrued benefits. Many employers make plan contributions not only to keep pace with currently accrued benefits but also to fund future liabilities, which although they have not yet been incurred, will be incurred in the future if the employer's actuarial projections concerning future increases in time-in-service and salary prove correct. Those future benefit accruals (which are not protected by the anti-cutback rule) are protected by the horizontal partial termination rule.

Were an employer allowed to avail itself of such a source of funds by deliberalizing benefits that have been promised, but not yet accrued, the employer would have an economic motive for amending a pension plan to eliminate or reduce future accruals of benefits promised by the plan. This is exactly what happened here. Chevron adopted a new pension plan that substantially reduced future accruals of benefits to former Gulf (but not former Chevron) employees at a time when the Gulf Plan was overfunded on an ongoing basis by $125 million. When Chevron made these changes it was aware of the potential economic advantage of doing so through either a reversion of the surplus or by using the surplus to fund future benefit obligations.

In defining the scope of the horizontal partial termination rule it is important not to lose sight of the remedy it affords. Neither ERISA nor the Code expressly protects "unearned" benefits, i.e., benefits based on future service. *See Blessitt v. Retirement Plan for Employees of Dixie Engine Co.*, 848 F.2d 1164, 1175 (11th Cir. 1988). Unlike breaches of ERISA's fiduciary provisions, which are remedied by damages, and violations of the anti-cutback rule of Code § 411(d)(6), which can result in disqualification of a plan, *see* Code § 401(a)(7), the remedy for a horizontal partial termination is merely to vest the affect-

---

**34.** The curtailment concept is a historical predecessor of both vertical and partial terminations. "A curtailment consists of a modification of a plan reducing benefits or employer contributions." *Goodman, supra,* at 54.

ed employees in accrued (i.e., earned) benefits (which were selected by the employer in the first place) to the extent they have been funded by the employer. The employer is saddled with no additional plan contributions, damages, or disqualification of its plan; the horizontal partial termination rule only reduces the employer's ability to obtain a reversion of its previous, tax-deductible, contributions to the plan.

▮ The Court does not find persuasive defendants' attempt to read into the horizontal partial termination rule a limitation that is not corroborated by the Code or its implementing regulations and that would disserve the policies underlying the rule.[35] Although the horizontal partial termination rule could have been drafted to make its meaning clearer, the Court concludes that the reductions in benefits imposed by the Chevron Retirement Plan satisfy both the language and purpose of the rule. The changes enacted by Chevron in benefits that would otherwise have been available to plaintiffs under the Gulf Pension Plan resulted in decreases in future benefit accruals within the meaning of the horizontal partial termination rule. These decreases increased the potential reversion to Chevron if the Chevron Retirement Plan were terminated. The Court therefore finds that a horizontal partial termination occurred as a result of the elimination of these future benefit accruals by merging the Gulf Pension Plan into the Chevron Retirement Plan. The Court will order that all members of the class who were employed by Chevron on July 1, 1986, be vested in all Gulf Pension Plan benefits accrued as of that date.[36]

▮ The Court also concludes that even were these reductions in future benefit accruals insufficient to result in a finding of horizontal partial termination, they would nevertheless be additional "fact[s] and circumstance[s]" that would support the Court's finding of a vertical partial termination. See Plan Termination Handbook § 252(8)(a) and (10).[37] The Court is not persuaded by defendants' argument that the combined effects of facts that could lead to findings of both types of partial terminations cannot be considered since the remedies for vertical and horizontal partial terminations benefit different groups of employees. Different remedies apply because different manifestations of an employer's conduct frustrate different employee expectations. A vertical partial termination affects non-vested terminated employees, and the remedy therefore is to vest them when their employment ended. A horizontal partial termination affects current employees through the cessation or decrease in future benefit accruals, and the remedy is to vest them in their then accrued benefits. Both the history and pur-

---

**35.** The Court is not persuaded by defendants' argument that since the remedy for partial terminations is only vesting of benefits accrued to the date of the partial termination, the rule could not have addressed reductions or decreases in future benefit accruals because it does not fully redress that wrong. (Defendants' Post–Trial Brief Regarding Horizontal and Vertical Partial Termination at p. 4) Although the vesting remedy may not provide complete relief in every case, it does provide a remedy that is easy to calculate for affected employees. That the remedy chosen by Congress may not always fully address the wrong sought to be corrected does not mean, as defendants seem to suggest, that the Court should decline to reach a result that affords even that limited remedy.

**36.** Perhaps the only advantage of the absence of precedent dealing with horizontal partial terminations is that this rule has not become encrusted with the significant number or percent analysis that complicates the vertical partial termination rule. Nevertheless, should a higher court adopt a percentage analysis, the Court finds that even adopting the defendants' argument of only a ten percent reduction in prospective benefit accruals ($102 million divided by $1.016 billion; see Defendants' Post–Trial Brief Regarding Horizontal and Vertical Partial Terminations at pp. 10–11), that percentage reduction would be substantial and would result in a partial termination.

**37.** Before ERISA both types of partial terminations were contained in the same rule. Treas. Reg. § 1.401–6(b)(2) (September 16, 1963). Before then, they were both examples of the curtailment concept. See Mim. 6136, 1947–1 C.B. 58, 60 at para. 5. Although their organization in the current Treasury Regulations has changed slightly, both types of partial terminations are intended to achieve the same policies—deterring employer reversions of tax-free plan contributions and protecting the expectations of employees. See United Steelworkers, 706 F.2d at 1298.

pose of the partial termination rule convince the Court that horizontal partial terminations defined in the "special" rule are merely a particular type of partial termination covered by the "general" rule. *See* Treas.Reg. 1.411(d)–2(b)(1) and (2).

## III. REMEDY FOR PARTIAL TERMINATION

The remedy provided by Code § 411(d)(3) for a partial termination is to vest all nonvested plan members in accrued benefits on the date of the partial termination. Plaintiffs argue that the Gulf Pension Plan also entitles them to an allocable share of surplus assets upon a partial termination. Analysis of this claim first requires some understanding of the history of the Gulf Pension Plan.

### A. *The Gulf Pension Plan*

■ The Gulf Pension Plan was created in 1975 as an amendment, restatement and continuation of the Annuity and Benefits Plan of Gulf Oil Corporation ("A & B Plan"), the Supplemental Annuity Plan of Mene Grande Oil Company ("SAP") and the Contributory Retirement Plan of Gulf Oil Corporation ("CRP"). The A & B Plan, originally established in 1944 as the successor of a 1927 plan, contained only employer contributions. The SAP, established in 1957, covered employees in Venezuela who worked for the Mene Grande Oil Company. The CRP, established in 1963, was a continuation of the Employees' Savings Plan of Gulf Oil Corporation ("ESP"), which was created in 1950. Plaintiffs' Ex. 1249 depicts this history.

Both the SAP and the CRP contained employee and employer contributions. The SAP and CRP have never been terminated, although no additional employee contribu- tions were made to these plans after December 31, 1970. Gulf made no contributions to either plan after they were amend-

ed in 1975.[38]

After the 1975 amendments Gulf generally administered the three plans as a single merged plan. However, the Gulf Plan acknowledged that the trust funds of the three plans would be separately maintained and not merged. (January 1, 1976, Gulf Plan Foreword, paragraph 1, and § 8.A.; Plaintiffs' Ex. 401 at pp. 1 and 51)[39] From 1976 to 1979 the plans' assets were governed by separate trust agreements.[40] Beginning in 1979 the plans' assets were governed by a single "Master" Trust Agreement that allowed commingling of assets attributable to the three plans for investment purposes. The Master Trustee was required, however, to account separately for the assets and liabilities of each plan and to "insure that benefits and liabilities payable with respect to each Plan shall be paid only from the assets held by the Master Trustee which are allocable to each such Plan." (1979 Master Trust Agreement § 2.6, Plaintiffs' Ex. 391 at p. 4) There was no evidence that Gulf ever used the assets of one plan to pay benefits under another plan, and Gulf continued to account separately for the assets and liabilities of each plan.

Defendants cite an IRS determination approving the 1975 plan merger (Defendants' Ex. 3) and a certification from Gulf's enrolled actuary (Defendants' Ex. 7) as evidence that the plans were merged in 1975. The Court does not find that the correspondence that defendants furnished between the IRS and Gulf supports defendants' first argument. In this correspondence Gulf stated that "the trust funds are being continued as separate trust funds" (June 2, 1976, letter, Defendants' Ex. 3 at p. G4B017104), but failed to mention that assets of one trust were unavailable to pay benefits due under other plans. An earlier letter made the same statement, and en-

closed a number of documents, but not the trust agreements (December 29, 1975, letter, Defendants' Ex. 3 at p. G4B001055). Both IRS determinations contain less than a page of text and are largely form documents that evidence no awareness of the trusts' limitations and contain no legal or factual analysis. (Defendants' Ex. 3 at pp. G4B006896 and G4B001058) The actuarial certification only addressed the validity of the merger under § 208 of ERISA, 29 U.S.C. § 1058. Before the propriety of a proposed merger under § 208 of ERISA even becomes relevant, the plans must first qualify as a single plan under ERISA. *See* Treas.Reg. § 1.414(1)–1(b)(2), IRS Private Letter Rulings 7918014 (January 30, 1979), 7943126 (July 27, 1979), and 8725089 (March 27, 1987). The Court therefore accords little weight to the IRS determinations and the actuarial certification.

In determining whether a merger of plans has occurred, "the substance rather than form of a transaction controls." IRS Private Letter Ruling 8725089 at p. 2; *see* PBGC Opinion 85–2 (January 14, 1985). Although defendants met some of the formalistic requirements of a plan merger, and although defendants frequently refer to the 1975 "plan merger" (and the Court sometimes does so for ease of style), the Court finds that the three plans were not merged in 1975 into a "single plan" under ERISA because all of the assets of each plan were not available on an ongoing basis to pay benefits due under the other plans. *See* Treas.Reg. § 1.414(1)–1(b)(1).

## B. *Remedy Under the Gulf Pension Plan Upon a Partial Termination*

Before July 1, 1986, when the Gulf Pension Plan was merged into the Chevron Retirement Plan, §§ 4.D and 10.A.2 of the Gulf Plan addressed the consequences of a

---

**38.** Whether Gulf made contributions from 1970 to 1975 is disputed. See part III.B.2.b.(2)(c)(ii), *infra.*

**39.** Citing this and other Plan language, a May 16, 1978, confidential Gulf memo states that "[i]t would be morally wrong to commingle the funds since we have told employees that the trust funds will not be merged." (Plaintiffs' Ex.

1073) In an April 24, 1978, legal opinion, Gulf attorney William Bowman gave the same advice in more formal terms. (Defendants' Ex. 250)

**40.** Plaintiffs' Ex. 443, 1976 CRP Trust Agreement; Plaintiffs' Ex. 419, 1976 SAP Trust Agreement; Plaintiffs' Ex. 390, 1976 A & B Trust Agreement.

plan termination. Section 4.D required that in the event of a partial plan termination all Plan participants were to be vested in their pension benefits regardless of years of service. Section 10.A.2, which addressed both complete and partial plan terminations, provided in pertinent part:

> *Distribution of Assets.* Upon termination of the Plan the rights of members to the benefits accrued under the Plan to the date of such termination, to the extent then funded, shall be nonforfeitable. All of the assets held in trust, after provision for any properly chargeable expenses, shall be used solely for the members, pensioners, spouses, beneficiaries and joint pensioners until all liabilities under the Plan shall have been satisfied in full. The Benefits Committee shall determine on the basis of an actuarial valuation the share of the funds of the Plan allocable to each member, pensioner, spouse, and joint pensioner in the following order.
>
> (The Plan then sets out a six-tier schedule for the distribution of assets upon termination.)
>
> . . . . .
>
> In the event of a partial termination of the Plan the provisions of this section 10 A–2 shall be applicable to the members affected by such partial termination.[41]
>
> In no event shall any part of the Plan assets held in trust or any income on it, prior to the satisfaction of all liabilities under the Plan, revert to the Company or be used other than for the members, pensioners, spouses, beneficiaries and joint pensioners. (Defendants' Ex. 29 at pp. 44–45)

Plaintiffs argue that § 10.A.2 entitles them to a distribution of all surplus assets of the Gulf Plan upon a partial plan termination.[42] Defendants do not dispute that upon a complete termination of the Gulf Plan members would be entitled to a return of surplus CRP and SAP assets that are attributable to their own contributions. *See* § 4044(d)(2) of ERISA, 29 U.S.C. § 1344(d)(2). Defendants deny, however, that § 10.A.2 or the three predecessor plans afford plaintiffs any right to surplus assets resulting from employer contributions. Alternatively, defendants argue that if plaintiffs are entitled to that part of the surplus attributable to employer contributions, that right would only accrue, and any surplus assets would only be distributable, upon a complete Plan termination.

### 1. Standard of Review

■ ERISA fiduciaries are obligated to operate pension plans solely in the interest of participants in accordance with the instruments governing the plan. § 404(a)(1)(D) of ERISA, 29 U.S.C. § 1104(a)(1)(D). ERISA allows plan participants to sue to recover benefits provided them by the terms of a pension plan. § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). A § 502(a)(1)(B) action challenging benefit denials is reviewed under a *de novo* standard unless the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). If so, the administrator's decisions are reviewed under an abuse of discretion standard.

■ Section 7.C of the Gulf Pension Plan made the Gulf Plan Benefits Committee the administrator of the Plan for purposes of ERISA. (After the plan merger this responsibility was assumed by Chevron Corporation.) Section 7.C.4 gave the Benefits Committee all powers necessary to carry out the provisions of the Plan including, but not limited to, "the powers necessary to . . . construe and interpret the Plan and, subject to the provisions of the Plan, decide all questions of eligibility and determine the amount, time and manner of payment of any benefits hereunder."

---

**41.** This paragraph was added by a 1982 amendment. Compare Plaintiffs' Ex. 401, the 1975 Gulf Plan, with Plaintiffs' Ex. 402, the December 31, 1982, Gulf Plan.

**42.** Although plaintiffs deny that the three plans were merged in 1975, they acknowledge that the 1975 Gulf Plan was the amended plan document that governed each of the three plans from 1975 until July 1, 1986.

(§ 7.C.4(a); Defendants' Ex. 29 at p. 32) However, the Benefits Committee could not "add to, subtract from, or modify the terms of the Plan or change or add to any benefits provided by the Plan, or to waive or fail to apply any requirements of eligibility for benefits under the Plan." (Section 7.C.4 at p. 33) The language of § 7.C.4 is sufficient under *Firestone* for the abuse of discretion standard to apply.

▆▆▆ Application of the abuse of discretion standard may involve a two-step process. First, the Court must determine the legally correct interpretation of the plan's provisions. If the administrator did not give the plan the legally correct interpretation, the Court must then determine whether the administrator's decision was an abuse of discretion. *Jordan v. Cameron Iron Works, Inc.,* 900 F.2d 53, 56 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 344, 112 L.Ed.2d 308 (1990).

### 2. The Legally Correct Interpretation

▆▆▆ In determining the legally correct interpretation of a plan provision the Court must consider (1) whether the administrator has given a uniform construction to the plan, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) whether the interpretation results in any unanticipated costs. *Jordan,* 900 F.2d at 56.

### a. *Uniformity of Construction*

There was no evidence that before this action the Benefits Committee had ever determined whether § 10.A.2 required allocation of surplus assets to Gulf employees upon a partial termination of the Gulf Pension Plan.[43] Accordingly, there is no basis for finding that the Committee uniformly construed § 10.A.2 of the Gulf Plan.

### b. *Fair Reading of § 10.A.2*

Defendants advance three arguments why § 10.A.2 prohibits a distribution of surplus assets to plaintiffs: (1) § 10.A.2 was intended to apply to partial terminations only if the Plan was underfunded

at the time of the partial termination, and does not apply when, as here, there is a surplus; (2) § 10.A.2 was amended by § 18.d of the Chevron Retirement Plan, which states that all surplus assets belong to Chevron, not to plan participants; and (3) even were § 18.d held to be invalid with respect to CRP or SAP assets, and even assuming that plaintiffs were entitled to surplus assets from those plans, as a matter of law and under the terms of § 10.A.2, such a right would only accrue when the assets are distributed upon complete plan termination. The Court will examine each of these arguments in turn.

### (1) Does § 10.A.2 Apply When the Plan is Overfunded at the Time of a Partial Termination?

▆▆▆ Defendants offer a complex explanation why § 10.A.2 does not apply to partial terminations when the Plan is overfunded. Defendants begin this argument with an attempt to reconcile the last two paragraphs of § 10.A.2, which state:

> In the event of a partial termination of the Plan the provisions of this Section 10 A–2 shall be applicable to the members affected by such partial termination.

> In no event shall any part of the Plan assets held in trust or any income on it, prior to the satisfaction of all liabilities under the Plan, revert to the Company or be used other than for the members, pensioners, spouses, beneficiaries and joint pensioners.

At trial Barbara Creed, the head of the Employee Benefits and Deferred Compensation section of PM & S, agreed that the language of the first paragraph quoted above required that § 10.A.2 apply to partial as well as complete Plan terminations. Creed also testified that the first and last paragraphs of § 10.A.2 permitted an employer reversion of any surplus Plan assets upon a complete Plan termination. Creed testified that to determine Gulf's intent with respect to the effect of § 10.A.2 upon a partial termination, the Court must first determine the consequences under § 10.A.2 of a complete Plan termination. According

---

**43.** This does not mean, however, that Chevron and its outside counsel had not spent considera-

ble time analyzing the Gulf Plan. See part III.B. 3.c., *infra.*

to Creed, upon a complete termination of the Plan, once all liabilities were satisfied through a distribution of assets under § 10.A.2's six-tier allocation scheme, any remaining Plan assets would revert to Gulf. Because the Code prohibits employer reversions upon a partial termination,[44] Gulf could not achieve a reversion of any surplus assets upon a partial termination notwithstanding its reversionary rights under § 10.A.2. If the Plan were underfunded at the time of a partial termination, no reversion to Gulf would be possible because all Plan assets would be exhausted via the six-tier allocation scheme. Therefore, § 10.A.2 could apply when the Plan was underfunded at the time of a partial termination without running afoul of the Code rule prohibiting an employer reversion before a complete termination. Creed therefore concluded that since *Gulf* could not lawfully achieve a reversion upon a partial termination, Gulf must have intended that § 10.A.2 not apply to a partial termination if the Plan were overfunded. Although this analysis may arguably be supportable by a kind of reverse symmetry, it does not persuade the Court.[45]

The next to last paragraph of § 10.A.2 does not say that the treatment of partial terminations under § 10.A.2 is dependent upon the funding status of the Plan. The Plan makes no distinction between overfunded, fully funded, and underfunded Plan status. Given the plain language of § 10.A.2 and the failure of defendants to produce any contemporaneous evidence

that § 10.A.2 was to apply to partial terminations only if the Plan were underfunded, the Court will not read such an intent into § 10.A.2. The Court concludes that § 10.A.2 was intended to apply to partial terminations regardless of the level of Plan funding. Furthermore, the underlying problem on which Creed's analysis is premised—potentially illegal reversions to Gulf upon a partial termination—does not exist if, as the Court finds in part III.B.2.(b)(3), *infra,* no surplus assets are distributable under § 10.A.2 upon a partial termination.

(2) Does § 18.d of the Chevron Retirement Plan Bar Plaintiffs' Claims to Surplus Gulf Plan Assets?

Defendants argue that because § 10.A.2 of the Gulf Plan was amended by § 18.d of the Chevron Retirement Plan, plaintiffs have no right to any surplus Gulf Plan assets. Section 18.d expressly states that upon a plan termination surplus assets are to revert to Chevron.

Any residual assets of the Trust Fund remaining after such allocation shall be distributed to the Participating Companies if (i) all liabilities of the Plan for the accrued benefits of the Members, spouses, joint pensioners and Beneficiaries who have an interest in the Plan have been satisfied and (ii) such a distribution does not contravene any provision of law. (Defendants' Ex. 21 at p. 41)

Plaintiffs reply that § 18.d is invalid with regard to Gulf Plan assets for three rea-

---

**44.** The Code only allows an employer reversion upon a complete plan termination. Under Code § 401(a)(2) a plan is not a qualified trust for purposes of the Code unless it is "impossible, at any time prior to a satisfaction of *all* liabilities ... for any part of the corpus or income to be (within the taxable year or thereafter) used for ... purposes other than for the exclusive benefit of ... employees or their beneficiaries...." (emphasis added) Treas.Reg. § 1.401–2(b)(1) explains that the language of this section prohibits employer reversions prior to complete plan termination:

The intent and purpose in § 401(a)(2) of the phrase "prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust" is to permit the employer to reserve the right *to recover at the termination of the trust,* and *only at such termination,* any balance remaining in the

trust which is due to erroneous actuarial computations during the previous life of the trust. (emphasis added)

**45.** Creed also opined that the language of the first paragraph of § 10.A.2 stating that "[u]pon termination of the Plan the rights of members to the benefits accrued under the Plan to the date of such termination, to the extent then funded, shall be nonforfeitable" implied that the partial termination remedy is only available if the Plan is underfunded. However, this language is merely a restatement of the remedial language of Code § 411(d)(3). That statute does not say that plan benefits become nonforfeitable only in the event the plan is underfunded at time of partial termination—it merely says that you cannot vest a member in Plan assets that do not exist.

sons. First, plaintiffs contend that § 18.d violates ERISA's exclusive benefit rule, § 403(c)(1) of ERISA, 29 U.S.C. § 1103(c)(1), and Code § 401(a). Second, they contend that the merger of the Gulf and Chevron plans was illegal under the plan merger rules § 208 of ERISA, 29 U.S.C. § 1058. Finally, plaintiffs contend that § 18.d contravenes the A & B Plan, the CRP, and the SAP, which state that all plan assets are to be used for the exclusive benefit of participants and that all contributions are to be irrevocable. The Court will address each of these arguments to determine whether § 18.d bars plaintiffs' claims to surplus Gulf Plan assets.

### (a) *Validity of § 18.d Under ERISA's Exclusive Benefit Rule*

▇▇▇▇ Prior to ERISA the common law of trusts allowed employers to retain surplus assets. *Washington–Baltimore Newspaper Guild Local 35 v. Washington Star Co.*, 555 F.Supp. 257, 260 (D.D.C. 1983), *aff'd*, 729 F.2d 863 (D.C.Cir.1984). At common law when a trust had fully performed its purpose without exhausting the trust estate, a resulting trust arose by operation of law for the benefit of the creator of the trust unless he had manifested a different intention. *Pollock v. Castrovinci*, 476 F.Supp. 606, 616 (S.D.N.Y.1979), *aff'd mem.*, 622 F.2d 575 (2d Cir.1980); *Wilson v. Bluefield Supply Co.*, 819 F.2d 457, 464 (4th Cir.1987). Under ERISA employers may recapture surplus assets or amend plans to permit a reversion of such assets as long as the reversion does not violate ERISA and is not prohibited by the plan's language. *Wright v. Nimmons*, 641 F.Supp. 1391, 1406 (S.D.Tex.1986); *Washington–Baltimore Newspaper Guild*, 555 F.Supp. at 259. Section 403(c)(1) of ERISA, 29 U.S.C. § 1103(c)(1), sets forth the general rule regarding the use and purpose of pension plan assets. Known as the exclusive benefit rule, this section states in pertinent part:

> Except as provided in paragraph (2), (3), or (4) or subsection (d) of this section, or under sections 1342 and 1344 of this title (relating to the termination of insured plans), the assets of a plan shall never

inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

Despite its "exclusive benefit" language concerning the use of plan assets, § 403 of ERISA does not prohibit employer reversions. Section 4044(d)(1) of ERISA, 29 U.S.C. § 1344(d)(1), outlines the circumstances under which employers may recapture surplus assets.

> [A]ny residual assets of a single-employer plan may be distributed to the employer if—
>
> (A) all liabilities of the plan to participants and their beneficiaries have been satisfied,
>
> (B) the distribution does not contravene any provision of law, and
>
> (C) the plan provides for such a distribution in these circumstances.

Allowing an employer to recover surplus assets if these conditions are met is consistent with the policies underlying ERISA.

> Employers will continue to fund their plans under ERISA guidelines, but will not be penalized for overfunding in "an abundance of caution" or as a result of a miscalculation on the part of an actuary. Thus, employees will continue to be protected to the extent of their specific benefits, but will not receive any windfalls due to the employer's mistake in predicting the amount necessary to keep the Plan on a sound financial basis.

*In re C.D. Moyer Co. Trust Fund*, 441 F.Supp. 1128, 1132–33 (E.D.Pa.1977), *aff'd*, 582 F.2d 1273 (3d Cir.1978); *Washington–Baltimore Newspaper Guild*, 555 F.Supp. at 260. Consistent with § 4044(d) of ERISA, Code § 401(a)(2) allows a plan to qualify if it prohibits diversion of plan assets prior to the satisfaction of employees' liabilities.

These statutes "are clearly intended to ensure that while an employer is obligated to provide defined benefits to plan participants, the participants should not be able to claim a windfall stemming from the employer's accidental overfunding of a de-

fined benefit plan." *Washington–Baltimore Newspaper Guild,* 555 F.Supp. at 260. *See Pollock,* 476 F.Supp. at 612–613. The Court therefore concludes that § 18.d of the Chevron Retirement Plan does not violate ERISA's exclusive benefit rule.

(b) *Validity of the 1986 Plan Merger Under § 208 of ERISA*

▮ Plaintiffs argue that before the 1986 merger of the Gulf and Chevron plans, Gulf Plan participants would have received surplus Plan assets upon a termination of the Gulf Plan. After the merger, however, § 18.d expressly provided that any residual assets would revert to Chevron. According to plaintiffs, § 18.d therefore violates § 208 of ERISA because under § 18.d plaintiffs would not receive everything they would have received had the Gulf Plan terminated immediately prior to the 1986 plan merger. Section 208 of ERISA, 29 U.S.C. § 1058, provides in relevant part:

A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan after September 2, 1974, unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had been terminated).

Code § 414(*l*) sets forth a similar rule for plan qualification.

Under these statutes the benefits a plan participant would have received prior to a merger, upon a hypothetical plan termination, must be at least equivalent to the benefits the plan participant would receive after the merger, upon a hypothetical plan termination. Treasury Regulations promulgated pursuant to § 208 of ERISA limit the protections afforded by § 208 to ac-crued benefits, and provide that benefits other than accrued benefits may be modified, reduced, or eliminated in a plan merger without violating § 208 of ERISA or Code § 414(*l*). Treas.Reg. § 1.414(1)–1(e)(1) states:

Section 414(*l*) compares the benefits on a termination basis before and after the merger. If the sum of the assets of all plans is not less than the sum of the present values of the *accrued* benefits (whether or not vested) of all plans, the requirements of section 414(*l*) will be satisfied merely by combining the assets and preserving each participant's *accrued* benefits. This is so because all the *accrued* benefits of the plan as merged are provided on a termination basis by the plan as merged. However, if the sum of the assets of all plans is less than the sum of the present values of the *accrued* benefits (whether or not vested) in all plans, the *accrued* benefits in the plan as merged are not provided on a termination basis. (emphasis added) [46]

Plaintiffs concede that an entitlement to the actuarial surplus that may exist at any given time in an ongoing pension plan is not an "accrued benefit" for the purposes of regulations promulgated pursuant to § 208 of ERISA. (E.g., Plaintiffs' Corrected Trial Brief at pp. 87–88) *Accord, Van Orman v. American Insurance Co.,* 608 F.Supp. 13, 25–26 (D.N.J.1984) ("*Van Orman II*"); *Walsh v. Great Atlantic & Pacific Tea Co.,* 96 F.R.D. 632, 651–52 (D.N.J.), *aff'd,* 726 F.2d 956 (3d Cir.1983). The Court therefore concludes that the merger of the Gulf and Chevron Plans did not violate § 208 of ERISA or IRS regulations governing plan mergers.[47]

(c) *Validity of § 18.d Under the A & B Plan, the CRP and the SAP*

▮ Whether a pension plan permits a reversionary amendment turns on the doc-

---

**46.** In contrast to the horizontal partial termination rule, discussed *supra,* this regulation is another instance where the IRS chose the term "accrued benefits."

**47.** Plaintiffs also argue that § 18.d violates § 10.D of the Gulf Pension Plan. (Defendants'

Ex. 29 at pp. 47–48) However, § 10.D is merely a restatement of the language contained in § 208 of ERISA and Code § 414(*l*), and the Court rejects this argument for the reasons discussed above.

uments creating the plan. *Bryant v. International Fruit Products Co.,* 793 F.2d 118, 123 (6th Cir.), *cert. denied,* 479 U.S. 986, 107 S.Ct. 576, 93 L.Ed.2d 579 (1986); *Wilson v. Bluefield Supply Co.,* 650 F.Supp. 578, 581 (S.D.W.Va.1986), *aff'd,* 819 F.2d 457 (4th Cir.1987). Because the three plans that were amended and restated as the Gulf Plan were not a single ERISA plan, the Court must analyze the validity of § 18.d of the Chevron Retirement Plan in light of the language of each of these plans. Even had the three plans been merged into a single ERISA plan in 1975, the same analysis would be required since the three plans had previously been administered separately. *See Bryant,* 793 F.2d at 122–23 (Court examined 1959 plan and trust instruments to determine the legality of a 1982 reversion amendment). This analysis requires the Court to review the language of each plan and its constituent trust agreement to determine whether they (1) allowed a reversion by Gulf, and (2) reserved to Gulf the right to later amend the plan to allow a reversion.

### (i) The A & B Plan

■ Plaintiffs argue that § 10 of the 1944 A & B Plan prohibited both employer reversions and reversionary amendments by stating that all employer contributions were to be "irrevocable" and would be used for the "exclusive benefit" of plan participants. Section 10 provided in pertinent part:

Section 10. Provision for Agreement of Trust

In order further to implement the Plan the Corporation has entered into an Agreement of Trust to the end that such funds, as may be *irrevocably contributed* from time to time for the payment of all or any part of the annuities under the Plan, shall be segregated from the Corporation's own assets and held in trust for the *exclusive benefit of the participants, retired participants or their beneficiaries* under the Plan who may in accordance with the terms of such Agreement of Trust be entitled to participate thereunder. To the extent that reserves are provided under such a trust

fund to cover all or part of the benefits under this Plan, the payment of such benefits shall be a charge against the Trust Fund and only the remaining part, if any, of such benefits shall be charged directly to the Corporation. (Plaintiffs' Ex. 448 at p. 11) (emphasis added)

. . . .

However, §§ 1 and 9 of the accompanying trust agreement created an *implied reversion* of surplus plan assets to Gulf.

... Any and all contributions made by the Corporation shall be *irrevocable* and no part of the corpus of the Fund nor any income therefrom shall *at any time prior to the satisfaction of all liabilities under the Plan revert to the Corporation or be used for or diverted to purposes other than for the exclusive benefit of participants,* retired participants or their beneficiaries under the Plan. (A & B Plan Agreement of Trust, § 1, Plaintiffs' Ex. 448 at p. 24) (emphasis added)

. . . .

In no event shall any part of the corpus of the Fund or any income therefrom at any time *prior to the satisfaction of all liabilities under the Plan revert to the Corporation or be used for or diverted to purposes other than for the exclusive benefit of participants,* retired participants or their beneficiaries under the Plan. (A & B Plan Agreement of Trust, § 9, Plaintiffs' Ex. 448 at p. 33) (emphasis added)

. . . .

In 1975 when the A & B Plan was amended and restated as the Gulf Pension Plan, Gulf's implied right of reversion was preserved in § 10.A.2, which stated in the last paragraph:

In no event shall any part of the Plan assets held in trust or any income on it, *prior to the satisfaction of all liabilities* under the Plan, revert to the Company or be used other than for the members, pensioners, spouses, beneficiaries and

joint pensioners. (Defendants' Ex. 29 at p. 45) (emphasis added)

Similar language appeared in the first paragraph of § 10.A.2.

The original A & B trust agreement gave Gulf unilateral power to amend the plan and the trust agreement and did not prohibit an amendment that would allow a reversion to Gulf.

> Section 10. Amendment of Trust Agreement or Plan
>
> Subject to the provisions hereinafter set forth in this Section 10, the Corporation reserves for itself and its successors the right, at any time and from time to time, by action of its Board of Directors (or the Board of Directors of such successors) to modify or amend, in whole or in part, any or all of the provisions of this Agreement of Trust and of the Plan. All such modifications or amendments relating to classification of employees, contributions or benefits shall be uniform in their nature and application shall be applied to all those similarly situated ... (A & B Plan Agreement of Trust, Plaintiffs' Ex. 448 at pp. 34–35)

This amendment authority was confirmed in § 8 of the Plan.

> The Board of Directors shall have the right, at any time, to withdraw or modify this Plan. The Corporation guarantees that once an annuity has accrued and has been granted by the Annuity Committee as a regular allowance, it will be continued for the life of the annuitant or his beneficiary nominated in accordance with the provisions of Section 5(3), subject, however, to the provisions of this Plan as it is in effect at the time such annuity is granted. (Plaintiffs' Ex. 448 at p. 10)

Notwithstanding the implied right of reversion of surplus assets and the absence of any prohibition of an amendment allowing such a reversion, plaintiffs argue that amendments allowing reversions to Gulf were prohibited by exclusive benefit language found in the amendment provisions of the 1961 amended A & B Plan and the 1975 Gulf Plan. Sections 11(8) and (9) of the 1961 A & B Plan stated:

> (8) The Board of Directors reserves the right at any time and from time to time to modify or amend, in whole or in part, any or all of the provisions of the Plan, provided that:
>
> (a) No modification or amendment may be made which will deprive any person of any benefit under the Plan which has accrued on or prior to the time of such modification or amendment, and
>
> (b) No such modification or amendment shall make it possible for any part of the Trust Fund to be used for, or diverted to, purposes other than for the *exclusive benefit* of participants and retired participants, or their beneficiaries under the Plan.
>
> ....
>
> (9) ...
>
> In no event shall any part of the corpus of the Trust Fund or any income therefrom at any time prior to the satisfaction of all liabilities under the Plan revert to the Corporation or be used for or diverted to purposes other than for the *exclusive benefit* of participants, retired participants or their beneficiaries under the Plan. (Plaintiffs' Ex. 449 at p. 10) (emphasis added)

Section 9.9 of the 1975 Gulf Pension Plan did not substantially change the amendment authority of the 1961 amended A & B Plan. It stated:

> (9) *Right of Amendment*
>
> The Company reserves the right to modify or amend the Plan, in whole or part, provided that:
>
> (a) No modification or amendment may deprive any member or other person of any benefits accrued to date, and
>
> (b) No modification or amendment shall allow any Plan assets to be used for, or diverted to, purposes other than the exclusive benefit of the members, pensioners, spouses and other joint pensioners and beneficiaries. (Defendants' Ex. 29 at p. 41)

 If ERISA or the Code do not bar a contemplated asset distribution, judicial review of plan language concerning

such a distribution is guided by general principles of contract construction. Although a minority of courts have held that the inclusion of "exclusive benefit" language such as in the A & B Plan of the Gulf Plan prohibits an employer's recapture of surplus assets, the majority of courts, including this Court, has held that exclusive benefit language is mandated by ERISA and the Code and that *standing alone* it cannot be read to prohibit a reversion of surplus assets. *See Wright,* 641 F.Supp. at 1406; *Chait v. Bernstein,* 835 F.2d 1017 (3d Cir.1987); *Pollock,* 476 F.Supp. at 612, 617.[48] The mere recitation of exclusive benefit language does not "represent a unique expression of its designers' desire to mandate that every penny, even amounts in excess of accrued benefits, must revert to employees." *Chait,* 835 F.2d at 1023. Rather, such language is standard language in every ERISA plan and merely rescribes the language of ERISA and the Code. *Id.*

█ A court must therefore look for additional language reflecting the employer's intent in using exclusive benefit language. A significant factor in determining the employer's intent in using such language is whether the plan contained a provision for the distribution of surplus assets to participants before the challenged amendment. *Wright,* 641 F.Supp. at 1406. Another factor is employer communications about asset distributions. While such communications are not part of the plan and cannot be used to modify plan provisions, they do provide an indication of the employer's intent. *Bryant,* 793 F.2d at 123.

In addition to the exclusive benefit language, the A & B Plan stated that all employer contributions would be "irrevocable." This language is not boiler plate required either by ERISA or Code § 401(a) and is relevant in discerning Gulf's intent. While the predecessor to § 401(a) may have mandated the exclusive benefit language of the A & B Plan, it did not require that

employer contributions to a plan must be irrevocable. The legislative history of § 401(a) reflects that Congress expressly considered and rejected an irrevocability requirement for qualified plan status. *See* IRS General Counsel Memorandum 35351, May 29, 1973, at p. 4. Nor, as defendants argue, was the "irrevocable contribution" language of the A & B Plan required by Treas.Reg. § 1.404(a)–2(a)(2). This regulation, entitled "Information to be furnished by employer claiming deductions ...," merely lists the information that an employer must furnish the IRS in the first taxable year in which a deduction is taken in order to justify the deduction. The regulation imposes no substantive requirements on the contents of the plan. *See* IRS Technical Advice Memorandum 7002206860A, February 20, 1970 (National Office of the IRS rejects use by a district office of § 1.404(a)–2 for substantive support).

Nevertheless, the Court finds that the "irrevocable" language in the A & B Plan did not prohibit a Plan amendment allowing a reversion to Gulf. At common law a trust is irrevocable if the written instrument creating the trust was adopted by the settlor as the complete expression of his intent and did not allow the settlor to revoke the trust. RESTATEMENT (SECOND) OF TRUSTS § 330, Comment b (1959). Conversely, where the settlor reserved a power of revocation in the terms of the trust, he could revoke the trust in the manner and to the extent that he reserved such a power. A. Scott & W. Fratcher, THE LAW OF TRUSTS, § 330 (4th ed. 1987). The intention to reserve a power of revocation need not be stated in exact terms; it may be indirectly expressed or inferred from plan language. *Id.* at § 330.1. A statement that the trust is intended to be irrevocable will control to prohibit revocation unless this term is contradicted by other terms of the trust. G.G. Bogert & G.T. Bogert, TRUSTS & TRUSTEES, § 1000 (2d ed. 1983). If the meaning

---

**48.** Although ERISA was not enacted until 1974, long after the 1944 A & B plan, the original predecessor of current Code § 401(a), § 165(a) of the Internal Revenue Code of 1939, contained similar "exclusive benefit" language. *See* IRS General Counsel Memorandum 35351, May 29, 1973, at p. 3.

of the trust instruments' language is uncertain or ambiguous as to whether the settlor intended to reserve a power of revocation, evidence of the circumstances under which the trust was created can be used to determine its interpretation. RESTATEMENT (SECOND) OF TRUSTS § 330, Comment b (1959).

The A & B Plan contained conflicting language about revocation. Although the plan and trust language cited by plaintiffs stated that all Gulf contributions were "irrevocable," that language was contradicted by §§ 1 and 9 of the Agreement of Trust in which Gulf impliedly reserved the right to take a reversion of surplus assets. The most logical way to harmonize this apparent conflict, and to give meaning to all of these provisions, is to conclude that Gulf intended that it could not withdraw its contributions from the trust until all plan liabilities had been satisfied.

The circumstances surrounding the creation of the A & B Plan and Agreement of Trust also indicate that the "irrevocable" language was not intended to prohibit a reversion by Gulf. Although the A & B Plan and the CRP and SAP all contained "irrevocable" language, there were material differences in the context in which this language appeared. Unlike the irrevocable language in the CRP and SAP, *discussed infra*, the irrevocable language in the A & B Plan and Agreement of Trust was accompanied by language, sometimes in the following sentence, implying a right of reversion to Gulf after all Plan liabilities had been satisfied.[49] Also, unlike the CRP and SAP, no version of the A & B Plan ever contained a schedule for distributing surplus assets to plan participants.

 The Court does not find, as urged by plaintiffs, that § 14.4 of the 1976 Agreement of Trust (Plaintiffs' Ex. 390 at p. 19),

which then governed only the A & B portion of the Gulf Pension Plan, required that surplus assets be distributed to Plan participants. That provision merely instructed the trustee that if the Plan were silent as to the distributions to be made upon a termination, or if the terms of the Plan were inconsistent with then applicable law, the trustee "shall distribute the Fund to the participants and their beneficiaries in an equitable manner that will not adversely affect the qualified status of the Plan [and will be legal]." The Court finds that this provision was intended to give the trustee authority to completely distribute assets in an equitable manner upon a Plan termination if the Plan itself gave the trustee no guidance, or if that guidance was then unlawful.

Also, unlike the CRP, discussed *infra*, no evidence was presented of communication to Gulf employees regarding their right to surplus assets from the A & B Plan or the Gulf Plan.[50] The Court is not persuaded by plaintiffs' argument that Gulf's intent to prohibit both reversions and reversionary amendments is evidenced by language in the Gulf Pension Plan Summary Plan Descriptions (SPDs). The September 1, 1982, SPD, which was the last summary provided to participants prior to the July 1, 1986, merger, stated:

> The Company has the right to change the plan. But if it does, you should know that … it *cannot* make any change that would allow the assets of the Plan to be used for anything but the exclusive benefit of members or their beneficiaries …
> If the Company should ever terminate the Plan, the procedures in § 10 of the Plan will control who will get what from the trust assets. (Plaintiffs' Ex. 425 at p. 21) (emphasis in original)

Earlier SPDs use the same language. (E.g., Plaintiffs' Ex. 424, 1977 SPD at p. 21)

---

49. Compare § 10 of the A & B Plan (Plaintiffs' Ex. 448 at p. 11) and §§ 1 and 9 of the A & B Plan Agreement of Trust (Plaintiffs' Ex. 448 at pp. 24 and 45) with Article II of the ESP Agreement of Trust and CRP Amended Agreement of Trust (Plaintiffs' Exs. 428 at p. 36 and 441 at p. 6) and § 7 of the SAP and Article II of the SAP Agreement of Trust (Plaintiffs' Ex. 409 at pp. 11 and 16–17).

50. The significance of this should not be understated. No ox was muzzled in this case. *See* Deuteronomy 25:4. Some of the best lawyers in America have spent four years gleaning every fact and inference from Gulf's plans and communications about them.

This language is a restatement of the exclusive benefit language of the A & B Plan, the Agreement of Trust, and § 8.C of the Gulf Plan. (The only other communication from Gulf relied upon by plaintiffs—a May 3, 1984, letter from Gulf to plan participants [Plaintiffs' Ex. 505]—merely says that the merger with Chevron will not jeopardize accrued benefits.) Exclusive benefit language in a plan standing alone does not prohibit either reversions or reversionary amendments. Likewise, SPD language that merely paraphrases such a plan provision does not evidence Gulf's intent not to allow reversions or reversionary amendments. For the reasons discussed in part III.B.2.b.(3), *infra*, the Court also concludes that the reference in the SPD to "the procedures in § 10 of the Plan" does not reflect Gulf's intent that surplus assets be distributed to Plan participants.

Were the language of the Gulf Pension Plan free from doubt this lawsuit probably would not have consumed the time devoted to it by the litigants and the Court. Having carefully weighed the arguments of plaintiffs and defendants, the Court concludes that the Gulf Pension Plan, and its predecessor, the A & B Plan, did not prohibit the amendment allowing the right of reversion contained in paragraph 18.d of the Chevron Retirement Plan. Although the Court is somewhat troubled by the use of the word "irrevocable" in the A & B Plan and Agreement of Trust, the Court is nevertheless led to this conclusion because (1) the A & B Plan and the Gulf Plan and their accompanying trust agreements have always contained an implied right of a reversion to Gulf of surplus assets after all plan liabilities were satisfied, (2) these plans and trust agreements never prohibited an amendment allowing a reversion to Gulf, (3) unlike the CRP and SAP, no version of the A & B Plan ever contained a schedule or other provision for distributing residual assets to Plan participants, and (4) unlike the CRP and SAP, all contributions to the A & B Plan were made by Gulf.

This construction of the Gulf Plan is consistent with the policies underlying ERISA. It guarantees that the plaintiffs will receive all benefits accrued under the A & B Plan and the Gulf Plan. However, it also allows the employer, which made all of the plan contributions, to recover any remaining surplus after all plan liabilities have been satisfied. A contrary construction could deter employers from fully funding plans, or from erring on the side of plan members in making funding projections, out of fear that the penalty for making a mistake in funding calculations would be to forego an eventual right to receive any surplus upon termination of the plan. This consideration should not be understated. Underfunded pension plans can seriously prejudice members' rights to receive benefits provided to them by the plan and, even when those benefits are insured, can require the Pension Benefit Guaranty Corporation, and ultimately the taxpayers, to assume responsibility for them. From a policy standpoint, allowing an employer to obtain a reversion of a surplus attributable to overfunding is a better alternative, especially since as discussed in part II.B.3(a), *supra*, the substantial excise tax on reversions deters employers from terminating plans and taking reversions.

### (ii) The CRP

Plaintiffs argue that in § 8 of the ESP, Article II of the accompanying ESP Agreement of Trust, and Article II of the CRP Amended Agreement of Trust made all CRP contributions irrevocable and prohibited reversions of surplus assets to Gulf. These provisions stated in pertinent part:

In order to further implement the Plan the Corporation has entered into an Agreement of Trust with a corporate trustee to the end that the assets of each Fund of the Plan shall separately be held in trust for the *exclusive benefit* of members and annuitants, or their beneficiaries and contingent annuitants, who may in accordance with the provisions of the Plan be entitled to participate thereunder.... (ESP § 8, Plaintiffs' Ex. 428 at p. 17) (emphasis added)

. . . .

... Any and all contributions made by The Gulf Companies to the Annuity Fund and each Stock Bonus Fund shall be *ir-*

*revocable*, and no part of the corpus of any Fund, or any income therefrom or accretions thereto, shall revert to The Gulf Companies or be used for or diverted to purposes other than those provided for in the Plan.... (ESP Agreement of Trust, Article II, Plaintiffs' Ex. 428 at p. 36) (emphasis added)

. . . .

... Any and all contributions made by The Gulf Companies to the Annuity Fund and each Stock Bonus Fund shall be *irrevocable*, and no part of the corpus of any Fund, or any income therefrom or accretions thereto, shall revert to The Gulf Companies or be used for or diverted to purposes other than those provided for in the related Plan.... (CRP Amended Agreement of Trust, Article II, Plaintiffs' Ex. 441 at p. 6) (emphasis added)

In contrast to the A & B Plan, the ESP and CRP contained schedules for the distribution of all assets, including any surplus assets, to plan participants and beneficiaries upon a complete plan termination.

(6) The Board of Directors may terminate the Plan for any reason at any time. In the case of termination of the Plan, the cash, securities and properties then held in the Funds of the Plan shall be used for the exclusive benefit of the members and annuitants, or their beneficiaries and contingent annuitants. In such event, the share of each such person in the assets of each Fund of the Plan, i.e., the investments and cash held therein, shall be computed and distributed as follows:

(a) The investments and cash held in the Annuity Fund shall be allocated as follows:

. . . .

Fourth, the remaining balance in the Fund, if there is any after the distributions under First, Second and Third above, shall be divided among members and annuitants (including contingent annuitants in receipt of annuities) in the proportion which the amounts credited to each, under First, Second and Third above, bears to the total of the amounts credited to all such persons under First, Second and Third above. (ESP § 9(6), Plaintiffs' Ex. 428 at pp. 19 & 20)

. . . .

A. *Plan Termination*

The Board of Directors may terminate the Plan for any reason at any time. Upon termination of the Plan, all the Plan assets, after provisions for any properly chargeable expenses, shall be used solely for the members, annuitants, beneficiaries and joint annuitants.... [and] the assets shall be allocated as follows:

. . . .

Third, the remaining balance shall be divided among members, annuitants, and joint annuitants receiving annuities, in the ratio of the amount credited *to each* under FIRST and SECOND above bears to the total of these amounts credited to *all* such persons. (CRP § 7, Plaintiffs' Ex. 429 at p. 22)

Plaintiffs also argue that Gulf's intent to prohibit reversionary amendments to the CRP is evidenced by the ESP and CRP amendment authority provisions.

(5) The Board of Directors reserves the right at any time and from time to time to modify or amend, in whole or in part, any or all of the provisions of the Plan, provided that;

(a) No modification or amendment may be made which will deprive any member or other person of any benefits which have accrued on or prior to the time of such modification or amendment, and

(b) No such modification or amendment shall make it possible for any part of the Funds of the Plan to be used for, or diverted to, purposes other than for the exclusive benefit of members and annuitants, or their beneficiaries and continuant annuitants. (ESP § 9, Plaintiffs' Ex. 428 at pp. 18–19)

The same language was present in § 6 of the CRP, Plaintiffs' Ex. 429 at p. 22.

The features of the ESP were reiterated in the Questions and Answers that Gulf included in the ESP booklet "as a convenient aid to its understanding." (Plaintiffs' Ex. 428 at p. 22) Questions and Answers 19 and 52 stated:

> 19.Q. Are the contributions which will be made by The Gulf Companies irrevocable?
>
> A. Yes. All contributions made by The Gulf Companies to the Annuity Fund and to each Stock Bonus Fund will be irrevocable, and no part of the corpus of any Fund or any income therefrom or accretions thereto, will revert to The Gulf Companies or be used or diverted to purposes other than those provided for in the Plan. (ESP, Questions & Answers, Plaintiffs' Ex. 428 at p. 25)
>
> . . . .
>
> 52.Q. Can the Plan be amended or terminated?
>
> A. Yes. The Board of Directors may amend or terminate the Plan at any time. However, no modification or amendment may be made which will deprive any member or other person of any benefits which have accrued on or prior to the time of such modification or amendment, and no such modification or amendment shall make it possible for any part of the Funds of the Plan to be used for, or diverted to, purposes other than for the exclusive benefit of members and annuitants, or their beneficiaries and contingent annuitants; and in the case of termination of the Plan, the cash, securities, and properties then held in the Funds of the Plan shall be used for the exclusive benefit of the members and annuitants, or their beneficiaries and contingent annuitants. (ESP, Questions & Answers, Plaintiffs' Ex. 428 at p. 34)[51]

Like the A & B Plan, the ESP and CRP stated that employer contributions were to be "irrevocable" and that plan assets were to be used solely for the "exclusive benefit" of plan participants, and reserved the right of Gulf to amend the plan. However, unlike the A & B Plan, the ESP and CRP (1) contained no language impliedly reserving a right of reversion by Gulf, (2) barred an amendment that would permit a reversion to Gulf, and (3) allocated surplus assets to plan participants upon a complete plan termination.

Defendants respond that assuming *arguendo* that the original ESP and CRP prohibited reversions and reversionary amendments, such a right was nevertheless provided in the 1974 amended CRP. Section 7.2 of the 1974 Amended CRP deleted the earlier language that allocated any surplus to plan participants and substituted the following language:

> A. *Plan Termination*
>
> 1. Right of termination. The Board of Directors may terminate the Plan for any reason at any time and in such case neither the Company nor any other of The Gulf Companies shall be liable to make any further payments to the Annuity Fund or otherwise except to the extent, if any, required to fulfill the guarantees described in Section 7.
>
> 2. Distribution of assets. Upon termination of the Plan all of the assets in the Annuity Fund, after provision for any properly chargeable expenses, shall be used solely for the members, annuitants, beneficiaries and joint annuitants, until all liabilities under the Plan shall have been satisfied in full. . . .
>
> In no event shall any part of the Annuity Fund or any income on it, *prior to the satisfaction of all liabilities* under the Plan, revert to the Company or be used other than for the members, annuitants, beneficiaries and joint annuitants. (Plaintiffs' Ex. 439 at pp. 63–64) (emphasis added)

The Court is not persuaded by defendants' argument. Even after this amend-

---

**51.** A 1962 preliminary report on the ESP (Defendants' Ex. 314 at paragraph 5) also stated that "[u]nlike the Annuities and Benefits Plan none of the assets of the [ESP] can ever revert to the Corporation."

ment, the CRP trust agreement still stated that all contributions were irrevocable and that no trust assets could revert to Gulf. (CRP Amended Agreement of Trust, Article II; Plaintiffs' Ex. 441 at p. 6) This language was not deleted from the CRP trust agreement until 1976, when it was amended to adopt the language similar to the Master Trust Agreement of the Gulf Pension Plan, which did not require that contributions be irrevocable. (CRP Agreement of Trust as amended October 8, 1976, § 2.6, Plaintiffs' Ex. 443 at pp. 3–4)

Also, despite the fact that the CRP was amended in 1974 and the CRP trust agreement was amended in 1976 to include implied reversion language similar to that of the Gulf Plan and to delete the "irrevocable" language, under the original terms of the CRP and trust no right of reversion was reserved by Gulf. Changes in 1974 and 1976 could not create a right of reversion in the face of explicit language of the ESP and CRP trust agreements that trust funds were irrevocable and could not revert to Gulf. In fact, paragraph 3 of the 1976 amended Agreement of Trust stated that "[t]his Amendment and Restatement shall not increase or decrease any rights an employee may have had under the prior Trust, as amended." (Plaintiffs' Ex. 443 at p. 2)

■ Furthermore, even assuming *arguendo* that Gulf had a right of reversion after the 1974 amendment to the CRP or the 1976 amendment to the CRP trust agreement, that right would only apply to a surplus due to future employer contributions to the CRP trust. Gulf had no right to the CRP assets at the time of the amendment because those assets existed before the CRP or its trust agreement contained any implied right of reversion. *See Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.*, 624 F.2d 513, 517 (4th Cir. 1980). Although defendants presented evidence that Gulf's actuaries *recommended* that Gulf make additional contributions to the CRP after 1970, when employee contributions ceased, defendants offered no evidence at trial that Gulf *actually* made any contributions to the CRP (or SAP) after

1970. Based upon an extensive analysis of the reports of Gulf's actuaries and the IRS Form 5500's filed by Gulf and Chevron (see, e.g., Plaintiffs' Ex. 1330), which the Court finds persuasive, Dreher testified that it was highly unlikely that such contributions were ever made by Gulf.

Lastly, defendants argue that despite the language of the CRP and its trust agreements, the last paragraph of § 10.A.2 of the 1975 Gulf Pension Plan amended the CRP (and the SAP) to afford Gulf a right of reversion, and that the "irrevocable" language in the CRP and SAP trust agreements was deleted when these trusts became part of the "Master" Trust Agreement of the Gulf Pension Plan in 1979. The Court is not persuaded by these arguments for two reasons. First, neither § 10.A.2 nor the 1979 Master Trust Agreement could create a right of reversion because under the original terms of the CRP and SAP no right to revert trust contributions was reserved by Gulf. Second, even if Gulf had a right of reversion after 1975 or 1979, that right would only apply to a surplus due to subsequent Gulf contributions to the CRP or SAP, and there is no evidence that Gulf made contributions to the CRP or SAP after 1970.

While precedent is of limited value because the construction of a plan turns primarily on its unique language, two cases involving analogous plan language support the Court's conclusion that Gulf and Chevron could not amend the Gulf Plan to obtain a reversion of CRP or SAP assets. In *Re Reevie & Montreal Trust Co.*, 25 D.L.R. 4th 312 (Ont.App.1986), the Court analyzed language in a Canada Dry pension plan very similar to the language of the CRP and SAP. Like these plans, all contributions to the Canada Dry plan were irrevocable and the employer reserved the right to amend the plan. Section 11.1 of the original Canada Dry plan adopted in 1973 stated in pertinent part:

While it is the intention and hope of the Company to make contributions regularly and build up a reserve fund sufficient to provide all of the benefits contemplated under the Plan, the Company does

not assume a contractual obligation to continue its contributions. It *reserves the right to change, modify, suspend or discontinue the Plan, or reduce its contributions.* (emphasis added)

. . . .

However, all Contributions made by the Company are *irrevocable* and, together with all Contributions made by Members, may only be used *exclusively* for the *benefit* of Members, Retired Members, Eligible Spouses, Contingent Annuitants or their Beneficiaries. (emphasis added)

. . . .

If the Company should discontinue the Plan, Contributions made by the Company cannot be withdrawn, but must remain in the Trust Fund. In such event the Trust Fund shall be distributed among the Members . . . in an equitable manner determined by the [plan administrator] . . .

*Id.* at 314. In 1981 § 11.1 was amended to delete the "irrevocable" language and § 11.4 was added to provide:

Upon termination of the whole plan, any assets held by the Trustees remaining after full provision has been made for the accrued retirement income and other benefits as described in Section 11.1 may be used to increase benefits described in Section 11.1 in such manner as the Company, in its discretion, shall determine, subject to the provisions of Section 12.1. Any assets still remaining shall be returned to the Company.

*Id.* at 315. In a suit over the employer's right to revert surplus plan assets, the Court observed:

At the centre of this dispute lies the simple fact that the funds in dispute are trust funds. The settlors of the fund were the employer (Canada Dry Limited) and the employees. The pension plan and the trust agreement provide that the contributions were irrevocable and that the beneficiaries of the trust were the members of the pension plan (*i.e.*, the employees, spouses, etc.).

*Id.* at 317. Because in the original plan the employer had stated that trust assets were irrevocable and that upon the plan termination all assets would be distributed among the plan members, the Court held that, notwithstanding the broad amendatory power contained in the original plan, the employer could not exercise that amendatory power to create a reversion of surplus funds to itself. *Id.* at 317–18.

In *Bryant v. International Fruit Products Co.,* 793 F.2d 118 (6th Cir.), *cert. denied,* 479 U.S. 986, 107 S.Ct. 576, 93 L.Ed.2d 579 (1986), although the original plan did not provide for allocation of any post-termination surplus among plan members, the plan's amendatory language stated that "no such amendment shall cause or permit any part of the Trust Estate to revert to or be repaid to the Employer or be diverted to any purpose other than the exclusive benefit of the participants or their beneficiaries or estate. . . ." *Id.* at 120. The Sixth Circuit held that this provision went beyond traditional ERISA exclusive benefit language and prohibited a subsequent amendment allowing an employer reversion. Although the amendatory language in the CRP and SAP is not as strict as the amendatory language of the International Fruit Products plan, Gulf's interpretation of the CRP amendatory language in Answer 52, when read in tandem with the CRP and SAP provisions allocating surplus assets to participants upon a complete plan termination, leads to the same holding as in *Bryant.*

The Court concludes that the CRP prohibited both reversions and reversionary amendments and that § 18.d is therefore invalid as to that part of the Gulf Pension Plan surplus attributable to the CRP.

#### (iii) The SAP

Like the CRP, the SAP and its trust agreement (1) contained "irrevocable" and "exclusive benefit" language, but no language impliedly allowing a reversion to Gulf, (2) barred an amendment that would allow such a reversion, and (3) allocated surplus assets to plan participants upon a complete plan termination. Section 7 of the SAP and Article II of its accompanying

Agreement of Trust made all contributions to the SAP irrevocable and prohibited reversions to Gulf and precluded Gulf from amending the SAP to allow a reversion.

In order to implement the Plan, Mene Grande Oil Company has entered into an Agreement of Trust with a corporate trustee so that the contributions of the participants in such funds as the Participating Companies may contribute *irrevocably* from time to time for the payment of all or any part of the benefits under the Plan shall be segregated from the assets of the Participating Companies and held in trust in the Annuity Fund for the *exclusive benefit* of participants and annuitants, or their beneficiaries or contingent annuitants, who may be entitled to benefits under the Plan in accordance with the provisions thereof.... (SAP, § 7, Plaintiffs' Ex. 409 at p. 11) (emphasis added)

. . . .

... The Fund, together with all income therefrom and all accretions thereto, shall be held by the Trustee in trust hereunder and shall be invested, reinvested and applied by it as hereinafter provided. Any and all contributions made by the Participating Companies to the Annuity Fund shall be *irrevocable,* and no part of the corpus of the Fund, nor any income therefrom or accretions thereto, shall revert to the Participating Companies or be used for or diverted to purposes other than those provided in the Plan. (SAP Agreement of Trust, Article II, Plaintiffs' Ex. 409 at pp. 16–17) (emphasis added)

Upon a complete plan termination, the SAP provided the following scheme for distributing plan assets:

(7) The Board of Directors may terminate the Plan for any reason at any time. In the case of termination of the Plan, the assets then held in the Annuity Fund, after provision for any expenses properly chargeable against the

Annuity Fund, shall be used for the exclusive benefit of participants and annuitants. In such event, the share of each party shall be computed and distributed, to the extent the assets shall be sufficient, as follows: ...

. . . .

Third, any balance remaining after the allocations under First and Second above shall be allocated to the participants in proportion to their accumulated contributions. (SAP § 8, Plaintiffs' Ex. 409 at pp. 12–13) [52]

The authority to amend SAP was stated in § 8 of the SAP and § 4.09 of the Agreement of Trust:

(6) The Board of Directors reserves the right at any time and from time to time to modify or amend, in whole or in part, any or all of the provisions of the Plan, provided that:

(a) No modification or amendment may be made which will deprive any participant or other person without his consent of any benefits under the Plan to which he would otherwise be entitled by reason of accumulated assets held under the Plan at the time of such modification or amendment and

(b) No modification or amendment shall make it possible for any part of the Annuity Fund under the Plan to be used for, or diverted to, purposes other than for the exclusive benefit of participants and annuitants, or their beneficiaries or contingent annuitants. (SAP § 8, Plaintiffs' Ex. 409 at p. 11)

. . . .

Subject to the provisions hereinafter set forth in this Section 4.09, Mene Grande Oil Company reserves for itself and its successors the right, at any time and from time to time by action of its Board of Directors (or the Board of Directors of such successors) to modify or amend, in whole or in part, any or all of the provisions of this Agreement and of

---

**52.** No evidence was presented of communications to employees regarding surplus asset distributions from the SAP.

the Plan. No such modification or amendment shall operate to deprive any participant or other person of any benefits which have accrued on or prior to the time of such modification or amendment, except that such modification or amendment may be applied retroactively if the Board of Directors deems it necessary or proper in order to bring the Plan or this Agreement into conformity with any law or governmental regulation relating to plans or trusts of this character.... (SAP Agreement of Trust, § 4.09, Plaintiffs' Ex. 409 at p. 22)

Defendants' responses concerning the SAP mirror their arguments about the CRP. Defendants respond that assuming *arguendo* that the original SAP language prohibited reversions and reversionary amendments, such a right was nevertheless provided in the 1973 amended SAP. Section 6.7 of the 1973 amended SAP deleted the earlier language that allocated any surplus to plan participants and substituted the following language:

. . . .

Upon termination of the Plan all of the assets in the Annuity Fund, after provision for any properly chargeable expenses, shall be used solely for the members, annuitants, beneficiaries and joint annuitants, until all liabilities under the Plan shall have been satisfied in full....

. . . .

In no event shall any part of the Annuity Fund or any income on it, prior to the satisfaction of all liabilities under the Plan, revert to the Company or be used other than for the members, annuitants, beneficiaries and joint annuitants. (SAP § 6.7, Plaintiffs' Ex. 415 at pp. 20–21)

The Court is not persuaded by this argument. Even after this amendment the SAP trust agreement still stated that all contributions were to be irrevocable and that no trust assets could revert to Gulf. (SAP Agreement of Trust, Article II; Plaintiffs' Ex. 409 at pp. 16–17) This language was not deleted from the SAP trust agreement until 1976 when it was amended to adopt language similar to the Master Trust

Agreement of the Gulf Pension Plan, which did not require that contributions be irrevocable. (SAP Agreement of Trust as amended October 8, 1976, § 2.6; Plaintiffs' Ex. 419 at pp. 3–4) (The amended SAP Agreement of Trust was identical in all material respects to the 1976 amended CRP Agreement of Trust.)

Also, despite the fact that the SAP was amended in 1973 and the SAP trust agreement was amended in 1976 to include implied reversion language similar to that of the Gulf Plan and to delete the "irrevocable" language, under the original terms of the SAP trust agreement no right of reversion was reserved by Gulf. Changes in 1973 and 1976 could not create a right of reversion in the face of explicit language of the original SAP trust agreement that trust funds were irrevocable and could not revert to Gulf. Like the 1976 amended CRP Agreement of Trust, Paragraph 3 of the 1976 amended SAP Agreement of Trust stated that "[t]his Amendment and Restatement shall not increase or decrease any rights an employee may have had under the prior Trust, as amended." (Plaintiffs' Ex. 419 at p. 2)

Furthermore, assuming *arguendo* that Gulf had a right of reversion after the 1973 amendment to the SAP or the 1976 amendment to the SAP Agreement of Trust, that right would only apply to a surplus due to future employer contributions to the SAP trust. Gulf had no right to the SAP assets at the time of the amendment because those assets existed before the SAP or its trust agreement contained any right of reversion, and there was no evidence that Gulf made contributions to the SAP after 1970.

The Court concludes that the SAP prohibited both reversions and reversionary amendments, and that § 18.d is therefore invalid as to that part of the Gulf Pension Plan surplus attributable to the SAP.

**(3) Can Surplus CRP and SAP Assets be Distributed Under § 10.A.2 Upon a Partial Termination?**

Defendants argue that even if plaintiffs are entitled to surplus assets attributable

to the CRP and SAP, that right can only vest, and such assets be distributed, upon a complete plan termination. Until then, defendants argue that these plans continue to accrue benefits, face future funding requirements and are subject to fluctuations in the investment market even if a partial termination has occurred. To resolve this argument the Court must determine whether either ERISA and the Code, or the CRP and SAP (as amended by the Gulf Plan), give plaintiffs a current right to surplus assets.

■ Complete plan terminations are governed by § 4041 of ERISA, 29 U.S.C. § 1341, which, prior to the Single–Employer Pension Plan Amendments Act of 1986, provided two methods of terminating an ERISA plan. First, a plan administrator could file a notice of termination with the PBGC and await its approval that plan assets were sufficient to discharge plan obligations. Upon receiving a sufficiency notice, the plan could be terminated. (The 1986 Act now requires 60 days' notice to participants, and no notice of sufficiency is issued.) Second, a plan administrator may terminate a plan by adopting an amendment that transforms the plan into an individual account plan under ERISA. The distribution of assets upon a plan termination is governed by § 4044 of ERISA, 29 U.S.C. § 1344. Neither the language of this statute nor its legislative history indicates that Congress intended plan participants to receive surplus plan assets prior to a complete plan termination. *Van Orman v. American Ins. Co.*, 680 F.2d 301, 313 (3d Cir.1982). Nor does the Code create an entitlement to a distribution of plan assets before a complete plan termination. Code § 411(d)(3) only requires that upon a partial termination accrued employee benefits be vested and employee accounts be nonforfeitable. "[T]he purposes and policies of partial terminations under the tax code do not apply in the context of vested employees attempting to gain plan surplus." *Chait*, 835 F.2d at 1021.

■ Although neither ERISA nor the Code creates a right to a distribution of surplus assets before a complete plan termination, such a right can exist under the law of contract if provided by a plan. Plaintiffs argue that § 10.A.2 of the Gulf Plan provides such a right. The Court is not persuaded by this argument. Section 10.A.2 is an amalgamation of the language found in or required by Code § 411(d)(3) and § 4044(a) of ERISA, 29 U.S.C. § 1344(a). The first paragraph of § 10.A.2 is very similar to Code § 411(d)(3). This paragraph states: "Upon termination of the Plan the rights of members to the benefits accrued under the Plan to the date of such termination, to the extent then funded, shall be nonforfeitable." This language and the policies of the Code requiring it do not entitle a plan participant to surplus plan assets. *See Chait*, 835 F.2d at 1021.

■ The next to last paragraph of § 10.A.2, upon which plaintiffs' argument is primarily based, also appears intended to comply with Code § 411(d)(3) and not to grant Gulf Plan participants a right to surplus assets upon a partial termination. Although this paragraph states that § 10.A.2 is to apply to partial as well as complete terminations, no other language in the Gulf Plan, or in any of the three predecessor plans, evidences that a plan participant is entitled to receive surplus assets upon a partial termination. The only provision in § 10.A.2 for distributing assets to Plan participants is the six-tier scheme mandated by § 4044(a) of ERISA.[53] Not only does this scheme not provide for the distribution of surplus assets to Plan participants, but the first, and especially the last, paragraphs of § 10.A.2 imply that any surplus is to be distributed to Gulf rather than to Plan participants. The next to last paragraph of § 10.A.2 was apparently included to make clear that if a partial termination occurred when the Plan did not have sufficient assets to vest Plan participants in all benefits

---

**53.** Section 4044(a) is merely a mechanism for the orderly distribution of benefits already earned or accrued under the terms of a plan, and a distribution scheme enacted to comply with § 4044(a) does not confer upon plan participants a right to recover unaccrued benefits. *Mead Corp. v. Tilley*, 490 U.S. 714, 109 S.Ct. 2156, 2162, 104 L.Ed.2d 796 (1989).

accrued to that date, the six-tier allocation scheme would apply to determine how the available Plan assets would be allocated among Plan participants.[54]

Although § 10.A.2 is as far from a paradigm of clarity, the Court concludes that it does not provide CRP or SAP participants a current right to surplus plan assets. This conclusion is consistent with the policies of ERISA and with the language of all of § 10.A.2 when read both in the context of the Gulf Plan as a whole and in juxtaposition to the three predecessor plans.

### (4) Consequences of a Fair Reading of § 10.A.2

Plaintiffs are not entitled to a share of surplus Gulf Pension Plan assets attributable to the A & B Plan, and § 18.d of the Chevron Retirement Plan is therefore valid as to any Gulf Plan surplus attributable to the A & B Plan. Plaintiffs are entitled to surplus assets attributable to the CRP and SAP, and § 18.d is invalid to the extent that it contravenes that right. However, plaintiffs' rights to CRP and SAP surpluses do not vest, and such assets cannot be distributed, until a complete termination of these plans.[55]

### c. *Unanticipated Costs*

The third criteria for determining whether defendants' denials of plaintiffs' surplus claims was an abuse of discretion considers whether the denials resulted in unanticipated costs to the plans. Defendants' denials of plaintiffs' claims to surplus assets did not impose increased costs on the three plans since the surplus remains in the plans' (now Chevron Retirement Plan) trust.

### 3. Abuse of Discretion

Because the Court has found that defendants incorrectly denied CRP and SAP participants the right to surplus assets attributable to these plans, the Court must determine whether defendants' denials amounted to abuses of discretion. Three factors are important in this analysis: (1) the internal consistency of the plans under the defendants' interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies (the IRS, the Department of Labor and the PBGC), and (3) the factual background of the determination and any inferences of lack of good faith. *Batchelor v. International Brotherhood of Electrical Workers Local 861 Pension & Retirement Fund*, 877 F.2d 441, 445–48 (5th Cir.1989). Although the fact that an administrator's interpretation is not the correct one does not in itself establish that the administrator abused his discretion, "[w]hen [his] interpretation of a plan is in direct conflict with express language in a plan, this action is a very strong indication of arbitrary and capricious behavior." *Id.* (quoting *Dennard v. Richards Group, Inc.*, 681 F.2d 306, 314 (5th Cir.1982)).

### a. *Internal Consistency*

Defendants' denials of plaintiffs' surplus claims were inconsistent with the express language of CRP and SAP, which entitled CRP and SAP participants to an allocable share of surplus assets upon plan termination. Although § 18.d of the Chevron Retirement Plan states that surplus assets will revert to Chevron, and § 10.A.2 of the Gulf Plan impliedly reserves Gulf's right to take such a reversion, the CRP and SAP

---

**54.** Plaintiffs argue that a June 12, 1986, letter of William Bowman, who was a Gulf lawyer before joining PM & S in 1985, supports a finding that a partial plan termination would result in a *distribution of surplus assets under § 10.A.2.* The letter, which was written to suggest responses to class member claims, states in pertinent part:

> We ... find that no termination or a partial termination of the Gulf Pension Plan occurred because of the [Cumberland Farms] sale. Consequently, no Plan participant is entitled to any distribution of Plan assets as

you suggest in your letter. (Plaintiffs' Ex. 866 at p. 2)

The Court does not glean the inference urged by plaintiffs from this letter. To do so would be analogous to concluding that a court's denial of relief on the merits leads to an inference that a plaintiff would have been entitled to damages requested had the court not found against the plaintiff on the merits.

**55.** Since these are all questions of law, the Court would reach the same conclusions under a *de novo* standard of review.

prohibited reversions and reversionary amendments and allocated any plan surpluses to plan participants. Under the terms of the CRP and SAP and their accompanying trust agreements, all contributions to these plans belong to plan members, and Chevron's attempt to create a right of reversion is inconsistent with the language of the CRP and SAP and their trusts, especially when, as here, that attempt occurred after all contributions to these plans were made.

### b. Relevant Regulations

Because defendants' denials of plaintiffs' surplus claims precluded CRP and SAP plan participants from obtaining surplus assets of those plans, the Court finds that these denials were contrary to § 4044(d) of ERISA, 29 U.S.C. § 1344(d) and PBGC regulation implementing this statute. Section 4044(d)(1) allows an employer to recapture surplus assets upon a complete plan termination if three conditions are met. The third condition is that the plan provide for such a distribution. § 4044(d)(1)(C) of ERISA, 29 U.S.C. § 1344(d)(1)(C). PBGC Regulation § 2618.30 restates this section of ERISA. Not only did the CRP and SAP not provide for employer reversions of surplus assets, their trust agreements expressly prohibited reversions, and the plans allocated surplus assets to their participants. Accordingly, because defendants' denials of plaintiffs' surplus claims necessarily included a determination that surplus CRP and SAP assets belonged to Gulf and Chevron, they contravened § 4044(d)(1)(C) of ERISA and PBGC Regulation § 2618.30.

### c. Factual Background and Inference of Lack of Good Faith

 A pension plan administrator is entitled to less discretion if he labors under a conflict of interest. As the Fifth Circuit explained in *Lowry v. Bankers Life & Casualty Retirement Plan,* 871 F.2d 522, *cert. denied,* —— U.S. ——, 110 S.Ct. 152, 107 L.Ed.2d 111 (1989):

> We note that 'the arbitrary and capricious standard may be a range, not a point. There may be in effect a sliding scale of judicial review of trustees' decisions ...—more penetrating the greater

is the suspicion of partiality, less penetrating the smaller that suspicion is....

*Id.* at 525 n. 6. Consistent with this analysis the Eleventh Circuit has stated that "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1566–67 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

There was substantial evidence that Chevron considered how to revert the surplus Gulf Plan assets claimed by plaintiffs for its general corporate uses. In a confidential May 2, 1984, memorandum to Chevron Deputy Comptroller R.G. Williamson entitled "Cash Surplus Utilization SOCAL/Gulf Pension Plan," Comptroller G.K. Carter wrote that:

> We have quickly reviewed available information on the Socal and Gulf pension plans to determine how much surplus funding may exist that could possibly be utilized for general Corporate purposes. These are general numbers to be considered only as rough indications of a potential cash source. The message, however, is clear, substantial overfunding exists in terms of today's interest rates, especially in the Gulf plan ...

> ....

> The ultimate termination/merger of the Gulf plan into the Socal plan may provide an opportunity to utilize a significant portion of the existing surplus. As there is no lump sum provision, the overfunding for actives may be available as well as that of the retirees. We will investigate legal options that exist to extract overfunding, and will promptly advise the Benefits Staff that any commitments made in connection with the Gulf pension plan (like giving them a lump sum option) could have significant cash and financial effects and should be referred to the

Corporation Comptroller for review ... (Plaintiffs' Ex. 50)

Six days later Carter wrote Chevron Vice President J.N. Sullivan that: "[i]t is important that the company capture this overfunding either in the form of a higher purchase price to the buyer [of divested Gulf operations] or retention of the excess funding by the Gulf Plan (which ultimately can be used by Chevron)." (Plaintiffs' Ex. 51) Chevron's intent to revert the Gulf Plan surplus is also evidenced in an internal memorandum concerning negotiating strategies for the sale of Gulf operations. In a July 6, 1984, memorandum to Charles Mackdanz, manager of Chevron's benefits staff, Williamson wrote that "[t]he most important overall objectives are that ... no precedents be set that might be onerous for the divestiture negotiations or ultimate merger of Gulf and Socal plans in a fashion that allows excess asset reversion." (Plaintiffs' Ex. 86)

Chevron's planning to revert surplus Gulf Plan assets occurred despite concerns expressed by PM & S to Chevron that "the reversionary authority in the present Gulf Plan is weak and a serious legal question exists as to whether it can be amended to provide the desired language." (May 18, 1984, memo re "Gulf Asset Disposal" to Mackdanz from T.M. McNamara, managing partner of PM & S; Plaintiffs' Ex. 67 at p. 3) Subsequent legal analysis by PM & S did not quell this concern. Frank Roberts, a PM & S partner and former General Counsel of Chevron, advised Chevron in April 1985 that no reversions of Gulf Pension assets could be accomplished without adding an explicit reversion provision. After citing the statutory requirements of § 4044(d) of ERISA, Roberts wrote:

> ... The Gulf Pension Plan does not contain a specific reversion provision, although there are several sentences in the Gulf plan which imply that a reversion is contemplated. However, because of the specific statutory requirements set forth in § 4044(d)(1)(C) and because so much is at stake, I think it is essential to amend the Gulf Pension Plan to incorporate a specific reversion clause if the termination/reversion procedure is to be implemented. (Plaintiffs' Ex. 68 at p. 4)

In spite of the concerns raised by PM & S attorneys about the ability to take a reversion, Chevron continued to plan how best to benefit from the surplus assets of the Gulf Plan. The primary consideration whether to take a reversion was not the Gulf Plan language but rather whether a reversion would be profitable under tax laws. In a confidential May 1, 1985, memorandum to Sellers Stough, Chevron's Vice-President of Finance, Carter wrote that the Gulf Plan needed to be amended before the tax considerations could be resolved, but cautioned that the amendments should be done in a manner that would not be detected by Gulf Plan members.

> Unfortunately, certain initial steps which disclose a possible plan termination must be taken before we will accurately know if our 1985 tax position warrants a reversion. Specifically, the Gulf Pension Plan would have to be amended to clarify that, upon termination, surplus assets from the Plan will be returned to the Company. Such an amendment should be included with a series of less sensitive "change of control" amendments now planned for June 1 adoption.... Due to the sensitivity of this subject and the need for definitive action in advance of knowing whether such a reversion is warranted by a sizable domestic tax loss for 1985, we must now seek senior management guidance on whether we should proceed with these initial steps. (Plaintiffs' Ex. 102 at p. 2)

The ultimate decision not to seek a reversion of Gulf (or Chevron) pension plan assets before the merger of the plans on July 1, 1986, was not based on the uncertainties expressed by PM & S lawyers regarding the Gulf Plan language, but on a cost, benefit analysis weighing potential tax savings against the negative employee relations and publicity surrounding a reversion of pension plan assets. (May 2, 1986, memo from Carter to Stough, Plaintiffs' Ex. 54)

Although this abbreviated summary of the evidence of Chevron's lack of good

faith would ordinarily require the Court to use a "more penetrating" analysis in assessing defendants' denials of plaintiffs' surplus claims, the good faith issue is not so simple. There was no evidence that any of the plaintiffs' surplus claims were directed to the CRP or SAP surplus. Both plaintiffs' claims and Chevron's internal analysis focused exclusively on the language of the Gulf Plan, and in particular § 10.A.2.[56] Chevron's denials of the claims were generally predicated upon the absence of a partial termination, rather than the remedy available to claimants had such a termination occurred. Although for the reasons discussed above the Court finds that plaintiffs' claims necessarily subsumed within them the plaintiffs' entitlement to surplus assets under the three constituent plans, that does not mean that Chevron's denial of these claims, even in this situation of an obvious conflict, is evidence of a lack of good faith with respect to its implicit determination that CRP and SAP participants were not entitled to an allocable share of surplus assets upon a complete termination of those plans. The Court concludes that the evidence on the good faith component of the abuse of discretion standard is in equipoise.

### d. *Conclusion*

Defendants' implicit denials of plaintiffs' claims to surplus CRP and SAP assets upon a complete termination of these plans were contrary to a fair reading of the CRP and SAP. Since these denials were also inconsistent with the language of the CRP and SAP and were contrary to § 4044(d)(1)(C) of ERISA and PBGC Regulation § 2618.30, the Court finds that these denials, albethey implicit, were abuses of defendants' discretion. However, also implicit in defendants' denials of plaintiffs' surplus claims was defendants' determination that any rights of plaintiffs to CRP or SAP surplus assets did not vest, and such assets could not be distributed, until a complete termination of those plans. Because that determination is consistent with a fair reading of the CRP and SAP, as amended by the Gulf Plan, and with ERISA, defendants' refusal to pay surplus assets to CRP and SAP participants was not an abuse of discretion.

## IV. TERMINATION OF THE CRP AND SAP AS WASTING TRUSTS

Plaintiffs allege that when the Gulf Pension Plan and Chevron Annuity Plan were merged into the Chevron Retirement Plan on July 1, 1986, the CRP and SAP trusts were "dry" or "wasting" trusts whose material purposes had been accomplished. Therefore, regardless of the Court's ruling on their claims to the Gulf Plan surplus, plaintiffs allege that under the common law of trusts the CRP and SAP trusts should be terminated as of June 30, 1986, and all surplus assets distributed to CRP and SAP participants. Plaintiffs argue that this remedy would provide two additional benefits. First, it would give full effect to the CRP and SAP language that assets can never revert to Gulf, and upon plan termination any remaining assets are to be distributed to plan participants. Second, it would prevent any future misuse of CRP and SAP surplus assets to fund benefits of Chevron employees who were not participants in the CRP or SAP.[57]

---

**56.** The broadest claim found by the Court was a challenge to Chevron's reversionary amendment contained in a December 18, 1986, appeal to the Chevron Retirement Plan Review Panel by class member William Gill. (Plaintiffs' Ex. 1032 at pp. JK 000977) In paragraph two of his letter Gill complained that "[u]nder the provisions of the Gulf Pension Plan, no change can be made in the plan that would allow the assets of the Plan to be used for anything but the exclusive benefit of the members or their beneficiaries. Therefore, Chevron does not have the right to use any over-funded portion of the Gulf Pension Plan for other corporate purposes." Although the Court could not locate the Review Panel's

reply to Gill in the trial exhibits, Plaintiffs' Ex. 26 is a January 28, 1987, memorandum from PM & S suggesting a reply by the Review Panel to Gill and other claimants. The suggested reply said only that "[n]one of the assets held under the Chevron Retirement Plan, including Supplement A thereto (which constitutes a restatement of the Gulf Pension Plan) have been used, can be used, or will be used other than for the exclusive benefit of participants, future participants, former participants and beneficiaries."

**57.** Plaintiffs also argue that the CRP and SAP should be terminated to cure defendants' ongoing fiduciary breaches of using CRP and SAP

 Defendants reply that because ERISA preempts common law the Court must look only to ERISA and the Code to determine whether the CRP and SAP trusts are wasting. Defendants argue that under the Code a wasting trust can only occur if the accompanying plan is "frozen" or "terminating." The IRS defines a "frozen plan" as one in which all future accruals have ceased but the trust continues in operation. Plan Termination Handbook § 3(10)0(1). A "terminating plan" results when an amendment has been adopted to terminate the plan but trust assets have not yet been distributed. Revenue Ruling 89–87, 1989–2 C.B. 81. Defendants argue that the CRP and SAP are neither frozen nor terminating plans, and their trusts are therefore not wasting, because benefits continue to accrue to CRP and SAP participants for Chevron employment and because the CRP and SAP do not exist as separate plans, but were merged into the Gulf Plan in 1975 and then into the Chevron Retirement Plan in 1986. The Court finds plaintiffs' arguments more persuasive.

 Courts may apply federal common law to employee benefit plans to supplement ERISA. *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1297 (5th Cir.1989). However, a federal court does not have unlimited power to apply any legal doctrine it chooses in ERISA actions. ERISA is a " 'comprehensive and reticulated statute' which Congress adopted after careful study of private retirement pension plans." *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 510, 101 S.Ct. 1895, 1899, 68 L.Ed.2d 402 (1981). It establishes standards governing the "conduct, responsibility, and obligation for fiduciaries of employee benefit plans ... and [provides] for appropriate remedies, sanctions, and ready access to the Federal courts." § 2(b) of ERISA, 29 U.S.C. § 1001(b). ERISA also contains a broad preemption clause, § 514(a) of ERISA, 29 U.S.C. § 1144(a), and generally supersedes state law as it relates to pension plans. In this statutory environment, a court may apply federal common law to an ERISA plan only if ERISA does not expressly address the issue and the common law rule is consistent with the underlying purposes of ERISA. *Cefalu,* 871 F.2d at 1297. *See generally United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973).

 Both of these requirements are met in this case. ERISA's plan termination provisions do not address the issue of trusts that are wasting because their objectives have been satisfied. *See* § 4041 of ERISA, 29 U.S.C. § 1341. While the trusts associated with a "frozen" or "terminating" plan have been described as wasting trusts, neither the Code nor IRS rules address a trust that is wasting because its material purposes have been achieved. *See* Revenue Ruling 89–87, 1989–2 C.B. 81.

Resort to the common law of trusts is also consistent with the underlying purpose of ERISA, which is rooted in the common law of trusts and incorporates the core principles of several areas of trust law. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 954–55, 103 L.Ed.2d 80 (1989). "Congress ... intended that the courts 'draw on principles of traditional trust law' in formulating remedies for violations of ERISA's fiduciary standards." *Nieto v. Eker,* 845 F.2d 868, 872 (9th Cir.1988). In formulating equitable remedies under §§ 409(a) and 502(a)(3) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a)(3), courts have therefore looked to the law of trusts. *E.g., Eaves v. Penn,* 587 F.2d 453, 462 (10th Cir.1978).

 At common law if a trust did not state a definite term, it was deemed to last until its purpose was accomplished. Once the object of the settlor had been achieved, the trust was deemed to end since its continuation would be useless and might frustrate the intent of the settlor to a beneficiary or remainder interest. *See Brine v. Paine Webber, Jackson & Curtis, Inc.,* 745

---

assets to fund benefits for other Chevron employees. However, as the Court discusses in part V.C. & D., *infra,* plaintiffs have not proved that CRP and SAP assets have been used for such purposes.

F.2d 100, 104 (1st Cir.1984); G.G. Bogert & G.T. Bogert, TRUSTS & TRUSTEES § 1002 (2d ed. 1983). The purposes of the CRP were "to encourage employees to save a portion of their current compensation and to assist them in providing an additional income upon retirement, over and above the amounts payable under the Gulf Annuities and Benefits Plan and social security laws." (ESP, Plaintiffs' Ex. 428 at p. 3) The SAP expressed a similar purpose of "encouraging employees to save a portion of their current compensation to provide additional income upon retirement." (SAP, Plaintiffs' Ex. 409 at p. 1)

These objectives have been accomplished and there is no material purpose or further benefit to the CRP and SAP or their participants in continuing these trusts. Since membership in the CRP and SAP has been closed since December 31, 1970, and no employee contributions have been made since then, these plans and their trusts no longer serve the purpose of encouraging employee savings through contributions. Employed participants no longer earn significant additional benefits from service, and the trusts have more than enough assets to provide all future benefits due active and retired plan members and their beneficiaries.

Extrapolating from Plaintiffs' Ex. 1275, a January 1, 1985, report prepared by Gulf's actuary, plaintiffs' expert Dreher testified that there were 2,900 active and 16,000 retired and other inactive members of the CRP and SAP as of June 30, 1986. The average active member was in his 50's and would retire in 15 years or sooner, and the youngest plan member had a life expectancy of 32 years. The average age of the 16,000 inactive CRP and SAP participants was 68. Retired and other inactive plan participants accounted for approximately 94% of the liabilities of the CRP and SAP. (*E.g.*, Plaintiffs' Ex. 1325) On June 30, 1986, the CRP trust had assets of $279.3 million and a surplus after accounting for all present and future liabilities of $122 million. (Plaintiffs' Ex. 1325) The SAP trust had assets in excess of $4 million and a surplus in excess of $2 million. (Plaintiffs' Ex. 1255 at p. 9) Because most active CRP and SAP participants were close to retirement, their projected benefits from future service had a present value of only $4 million, which was *de minimis* in relation to the surplus assets in the plans. *Id.*[58]

Defendants admit that since June 30, 1986, these assets and surpluses have increased as benefit payments have declined. (See Defendants' Ex. 285.) Current earnings on the trust assets alone are more than sufficient to pay all benefits and still add money to the surpluses. According to Dreher, if the CRP and SAP are not terminated, when the last pensioner or widow or widower dies these plans will have assets of $1.3 billion with no liabilities assuming an 8%, below normal, annual growth rate.

Because the goals of the CRP and SAP have been accomplished, continuance of the CRP and SAP trusts would unnecessarily frustrate the intent of the settlors as to the disposition of surplus trust assets. The CRP and SAP state that Gulf intended all surplus assets to be allocated to plan participants, not the employer.[59] Because membership in the CRP and SAP has been closed for 20 years, the plans are substantially overfunded with respect to all future demands, and the trust assets cannot revert to Chevron, to forestall termination of the CRP and SAP would create the opportunity for Chevron to achieve by employee

---

**58.** Based on Chevron's historical practice of paying AVIS cost of living increases, Dreher testified that the cost of such increases would also be *de minimis*. Since June 30, 1986, the need to fund AVIS benefits for CRP and SAP participants has increased the liability of the plan trusts by only $7 million, or 1.9% of trust assets. (Plaintiffs' Ex. 1326) The evidence at trial reflected that although these payments are voluntary, Chevron has a history of declaring AVIS benefits averaging slightly less than 2%

per year. Assuming an annual growth of CRP and SAP assets at 10.5% per year (which Chevron witness Darling testified was a reasonable return on plan assets) even if Chevron more than doubled AVIS payments to 4.5% per year, CRP and SAP assets would grow to $2.4 billion by the time the last plan beneficiary died. (Plaintiffs' Ex. 1327)

**59.** See part III.B.2.b.(2)(c)(ii) and (iii), *supra.*

attrition what it is prohibited from obtaining under the plans' language. Such a result would be inconsistent with the goals and objectives of ERISA. Furthermore, since CRP and SAP members also contributed to these plans, they too are settlors under common law, and their intent would also be frustrated were these trusts not terminated. These plan members and beneficiaries, most of whom are retired, are getting older with each passing day, and prolonging the plans means that ever fewer participants will have the opportunity to enjoy the benefits of the plan surpluses.

Relying principally on *Walsh v. Great Atlantic & Pacific Tea Co.*, 96 F.R.D. 632 (D.N.J.), *aff'd*, 726 F.2d 956 (3d Cir.1983), and *Van Orman v. American Ins. Co.*, 680 F.2d 301 (3d Cir.1982), defendants argue that the existence of a plan surplus does not require termination of the plan or its trust under ERISA. Although this is a correct statement of the law, defendants' reliance on these cases is misplaced. In *Walsh* the court found that neither ERISA nor the plan language required termination of an overfunded plan. Not only did the court not address the wasting trust argument advanced in the case, but the court's discussion of the facts makes *Walsh* easily distinguishable on its facts. The *Walsh* court found that:

> It is undisputed that, prior to this lawsuit, the plan fund was 'overfunded' in the sense that, if termination were to have occurred, excess assets would have remained after satisfying liabilities created by the 'Benefits' section of the plan. Yet, A & P employed such excess assets in a variety of ways, such as by eliminating or reducing its contributions to the fund or by extending benefits or coverage. This was done without protest from any of the participants; none claimed the right to any part of such 'excess.'

96 F.R.D. at 650. Unlike the plan in *Walsh*, CRP and SAP membership has long been closed and the plans are substantially overfunded as to all future liabilities. The CRP and SAP are not accruing significant benefit obligations that could potentially eliminate their surpluses. Nor could the surpluses be used to eliminate or reduce future employer contributions since none have been made since 1970. Therefore, unlike the facts of *Walsh*, delaying termination of the CRP and SAP trusts would benefit neither the plans nor their participants in the future.

*Van Orman* merely holds that members of a defined benefit pension plan have no general right under ERISA or common law to a surplus upon a plan termination. This is a correct statement of the law, but like *Walsh* it does not address the present inquiry, which is whether under the facts of this case, the CRP and SAP trusts should be terminated and the surpluses distributed to plan participants under trust law.

Defendants also argue that the CRP and SAP cannot be wasting trusts because the 1975 Gulf Plan merger and the 1986 merger of the Gulf Pension Plan into the Chevron Retirement Plan did away with the CRP and SAP as separate plans. As discussed in part III.A. *supra*, the Court has found that the amendment, restatement and continuation of the three predecessor plans in 1975 did not result in their merger into a single ERISA plan. Furthermore, as discussed in part III.B.2.b.(2)(c)(ii) and (iii), the Court has found that § 18.d of the Chevron Retirement Plan is invalid as to that part of the Gulf Pension Plan surplus attributable to the CRP and SAP. For the reasons discussed above, the Court also finds that the CRP and SAP trusts were wasting trusts on June 30, 1986, before the merger of the Gulf Plan into the Chevron Retirement Plan. Under these facts, the CRP and SAP should not have been merged into the Chevron Retirement Plan.

The Court finds that as of June 30, 1986, before the effective date of the Chevron plan merger, the CRP and SAP were wasting trusts that should have been terminated. Pursuant to the authority granted by § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), to order "appropriate equitable relief" to enforce the rights of members and beneficiaries of the CRP and SAP, and the authority granted by § 409(a) of ERISA, 29 U.S.C. § 1109(a), to reform the Chevron Retirement Plan to bar Chev-

ron from achieving a reversion of CRP and SAP assets, *see Delgrosso v. Spang & Co.,* 769 F.2d 928, 937–38 (3d Cir.1985), the Court will require the CRP and SAP, and their assets and liabilities, to be spun-off from the Chevron Retirement Plan, as of June 30, 1986, according to the terms of the Final Judgment entered with this Opinion.

## V. FIDUCIARY CLAIMS

### A. *Pension Plan Expenses*

Plaintiffs allege that Gulf and Chevron improperly caused the Gulf Pension Plan to pay expenses of outside investment managers that should have been paid by Gulf and Chevron under the Plan. Section 7.D.2 and .3 of the Plan (Plaintiffs' Ex. 29) provided that the Pension Fund Investment Committee had the sole responsibility for the appointment of investment managers and other outside consultants to assist in supervising and managing plan assets. Section 7.A.4 of the Gulf Pension Plan states:

> **Committees' expenses.** Members of the Committees shall be reimbursed by the Company for any expenses incurred by the members of the Committees, individually or collectively, in the performance of their duties hereunder. *All expenses incident to the services of persons retained by the members of the Committees, individually or collectively, shall be paid by the Company.* (Plaintiffs' Ex. 29 at p. 25) (emphasis added)

Before 1982 Gulf paid outside investment management fees and expenses. From 1982 through the end of June 1986 Gulf and Chevron caused the Gulf Pension Plan to pay investment management fees and expenses in the following amounts:

| | |
|---|---|
| 1982 | $ 2,078,000 |
| 1983 | $ 2,759,000 |
| 1984 | $ 3,844,000 |
| 1985 | $ 3,766,000 |
| 1986 (first six months) | $ 2,778,000 |
| Total | $15,225,000 |

(Plaintiffs' Ex. 1228) [60]

Relying on *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), defendants argue that Gulf, Chevron, and the Gulf Pension Plan Benefits Committee are fiduciaries, that their decisions to pay these expenses from Plan assets should be reviewed under an abuse of discretion rather than a *de novo* standard, and that under this standard their payment decisions were not abuses of discretion. Defendants contend that *Firestone* is satisfied by § 7.C–4(a) of the Plan, which gave the Gulf Benefits Committee authority to "construe and interpret the Plan and, subject to the provisions of the Plan, decide all questions of eligibility and determine the amount, time and manner of payment of any benefits."

In *Firestone* the Court went out of its way to emphasize that its holding and analysis was very limited. The Court stated:

> The discussion which follows is limited to the appropriate standard of review in § 1132(a)(1)(B) [§ 502(a)(1)(B) of ERISA] actions challenging denials of benefits based on plan interpretations. We express no view as to the appropriate standard of review for actions under other remedial provisions of ERISA.

109 S.Ct. at 953. Although the Court permitted an exception to *de novo* review when an ERISA plan expressly delegated to the plan fiduciary the authority to determine benefits and interpret the plan, the Court emphasized that *"wholesale* importation of the arbitrary and capricious standard into ERISA is unwarranted." *Id.* (emphasis in original)

Plaintiffs' claim is not premised upon an erroneous denial of benefits under § 502(a)(1)(B) of ERISA, but is grounded instead upon breaches of fiduciary obli-

---

60. The years shown are those in which the expenses were incurred. Actual payments normally occurred the following year.

gations and Plan provisions actionable under §§ 406(a)(1)(D) and 502(a)(3) of ERISA, 29 U.S.C. §§ 1106(a)(1)(D) and 1132(a)(3). Section 406(a)(1)(D) of ERISA states:

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

. . . .

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan;

Employers such as Gulf and Chevron are parties-in-interest with respect to a plan covering their employees. § 3(14)(C) of ERISA, 29 U.S.C. § 1002(14)(C). Section 502(a)(3) of ERISA states:

A civil action may be brought—

. . . .

(3) by a participant, beneficiary, or fiduciary

(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

When a plaintiff sues to enforce an express statutory fiduciary duty under § 406(a)(1)(D) and to challenge acts of the employer, as a fiduciary, that advance the employer's own economic interest, the abuse of discretion standard does not apply. *See Struble v. New Jersey Brewery Employees' Welfare Trust Fund*, 732 F.2d 325, 333 (3d Cir.1984). Instead, the Court will apply the strict standards imposed by ERISA, which mandate that fiduciaries act "solely in the interests of the participants and beneficiaries" [the duty of loyalty] and with the "care, skill, prudence, and diligence ... that a prudent man acting in a like capacity ... would use ..." [the duty of care]. § 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1).

 Moreover, even if the *Firestone* analysis were applicable to this claim, the Court finds that defendants have failed to satisfy the express language test with respect to the payments at issue. Under this test discretion cannot be implied from an instrument's language.

[T]he circuit courts which have found that particular ERISA plans granted discretion to plan administrators or fiduciaries, in cases decided after *Firestone*, have uniformly rested this finding upon *express language* of the ERISA plan before them. (emphasis in original)

*Cathey v. Dow Chemical Co. Medical Care Program*, 907 F.2d 554, 559 (5th Cir. 1990), *cert. denied*, — U.S. ——, 111 S.Ct. 964, 112 L.Ed.2d 1051 (1991), *citing Moon v. American Home Assurance Co.*, 888 F.2d 86, 88 (11th Cir.1989). Although § 7.C.4(a) of the Gulf Plan gave the Benefits Committee the power to construe and interpret the Plan, the last sentence of § 7.C.4 stated:

The Benefits Committee shall have no power to add to, subtract from, or modify the terms of the Plan or change or add to any benefits provided by the Plan, or to waive or fail to apply any requirements of eligibility for benefits under the Plan.

Since § 7.A.4 of the Plan required that the expenses in issue "shall be paid by the Company," any discretion afforded the Benefits Committee by § 7.C.4 could not "subtract from, or modify [this expressed term] of the Plan." [61]

---

**61.** Relying principally on the June 23, 1983, minutes of the Investment Committee (Defendants' Ex. 336), plaintiffs argue that the Investment Committee, which had no discretion to construe or interpret the Plan, actually made the decision to pay these expenses from Plan assets. Although these minutes do recite the decision by the Investment Committee to pay such expenses out of Plan assets, they also direct the Committee's secretary "to advise the Benefits Committee of this decision and to request that it authorize the Trustee to make these payments out of the funds." *Id.* Given the lack of evidence on who ultimately made this decision, the Court finds that plaintiffs have failed in their burden of proof on this argument.

■ Applying the duty of loyalty and duty of care standards, the Court finds that defendants' payment of investment fees and expenses from Plan assets was contrary to the plain language of § 7.A.4 of the Plan and violated §§ 406(a)(1)(D) and 502(a)(3) of ERISA. Defendants' use of plan assets to satisfy an obligation expressly imposed by the Plan on Gulf resulted both in a use of Plan assets for the benefit of a party-in-interest prohibited by § 406(a)(1)(D) of ERISA and a violation of § 7.A.4 of the Plan that entitles plaintiffs to relief under § 502(a)(3)(A) of ERISA. Gulf need not have drafted the Plan to require it to pay these expenses, but having done so, it had to comply with that obligation.

■ Even were the Court to apply an abuse of discretion standard, the Court would reach the same result. *Jordan v. Cameron Iron Works, Inc.,* 900 F.2d 53 (5th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 344, 112 L.Ed.2d 308 (1990), teaches that the threshold determination in an abuse of discretion review is whether the plan fiduciary has "given a plan the legally correct interpretation." *Id.* at 56. If not, then a three-factor analysis is applied to determine whether the fiduciary's error rises to an abuse of discretion. *Id.*

To explain their departure from Gulf's long-standing policy of paying these expenses directly, defendants point to an April 29, 1983, letter from Gulf attorney William Bowman to R.A. McKean III, secretary of the Gulf Pension Fund Investment Committee. (Defendants' Ex. 338) After quoting § 7.A.4 of the Plan, Bowman stated that "this section does not support the position that these kinds of services must be paid for by the Company." Bowman then stated that the real question was one of policy—whether Gulf wanted all Plan expenses to be paid out of Plan assets. He concluded that there would be no net benefit to Gulf if such expenses were paid out of Plan assets since ultimately Gulf would have to make larger contributions to the Plan to compensate for such expense payments from Plan assets. The Court finds that Bowman's interpretation

and defendants' reliance on it is not legally correct. Applying the *Jordan* three-factor analysis, the Court also finds that defendants' determinations to pay these expenses from Plan assets rather than corporate funds were (1) inconsistent with prior practices and therefore were not part of any uniform construction of the Plan, (2) inconsistent with a fair reading of § 7.A.4 of the Plan, and (3) resulted in unanticipated costs to the Plan.

■ Defendants also seek to justify payment of these expenses from Plan assets by citing to §§ 9.1, 4.1, and 9.2 of the July 9, 1979, Gulf Agreement of Trust (Plaintiffs' Ex. 391). Section 9.1 provided for reimbursement of reasonable expenses incurred by the Master Trustee. Section 4.1 allowed the Master Trustee to pay trust expenses from the trust, as directed by the plan administrator. These two sections do not support defendants' argument because the expenses in issue were not incurred by the Master Trustee. The Investment Management Agreements pursuant to which these expenses were incurred were between the various investment managers and Gulf. (See Defendants' Exs. 342, 344 & 345.) In paragraph 16 of each of these agreements, Gulf agreed to pay the investment managers' fees.

Section 9.2 stated that "[a]ll compensation, expenses, taxes and assessments specified herein, to the extent that they are not paid by the Companies, shall constitute a charge upon the Trust and be paid by the Master Trustee from the Trust upon written notice from the Master Trustee to the Company." Defendants argue that this language is broad enough to permit payment of fees and expenses from the Trust and from the Gulf Pension Plan. The Court is not persuaded by this argument. Section 7.A.4 of the Gulf Pension Plan expressly required that such expenses be paid by Gulf, not the Plan. Nothing in the Agreement of Trust contradicted this, and the quoted language from § 9.2 of the Agreement of Trust appears to have been included only to protect the trustee in the event that expenses incurred by the trustee

**1208**

were not paid by Gulf, a situation not before the Court.

Having concluded that defendants' decisions to pay expenses from Plan rather than corporate assets were not legally correct, the Court must next look to whether the decisions were abuses of discretion under the three factors articulated in *Batchelor v. International Brotherhood of Electrical Workers Local 861 Pension & Retirement Fund,* 877 F.2d 441, 445 (5th Cir.1989). These payments were inconsistent with both § 7.A.4 of the Gulf Plan and Gulf's prior interpretation of it. Section 404(a)(1)(D) of ERISA, 29 U.S.C. § 1104(a)(1)(D), requires that a plan fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... in accordance with the documents and instruments governing the plan ..." Because these payments were inconsistent with § 7.A.4 they were also inconsistent with this statutory obligation. Finally, because of the conflict of interest affecting these decisions, the Court must gauge narrowly the good faith component of this analysis. *Lowry v. Bankers Life & Casualty Retirement Plan,* 871 F.2d 522, 525 n. 6 (5th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 152, 107 L.Ed.2d 111 (1989). Having considered these three factors, the Court finds that defendants abused their discretion in paying these expenses from Plan assets.

The Court will order that Chevron pay $15,225,000 to the Chevron Retirement Plan, to be held in trust for the use and benefit of class members who are beneficiaries of the Gulf Pension Plan. Because Gulf and Chevron, and not the Gulf Plan, have had the use and benefit of this money, the Court in the exercise of its equitable discretion will also order that Chevron pay prejudgment interest on this amount at the rate of 10%, compounded annually.[62]

B. *Self-Dealing by Chevron*

■ The Asset Purchase Agreement between Chevron, as Seller, and Cumberland Farms, as Buyer, required Cumberland

Farms to establish a pension plan for former Gulf employees who went to work for it. The Agreement also included a provision through which Chevron, prior to closing, fixed by means of actuarial assumptions, an amount of pension assets that Chevron would cause the Gulf Pension Plan to transfer to the Cumberland Farms' plan. (Cumberland Farms Asset Purchase Agreement, para. 3.2.e; Plaintiffs' Ex. 118 at p. 16) The Agreement provided that after the closing:

> ... In the event that the trustees of the Seller's Pension Plan Trusts are required pursuant to applicable law to transfer to the trustee of the Buyer's Pension Plan Trust an amount in excess of the amount finally credited to the Buyer Subaccounts pursuant to section 3.2.e, Buyer shall reimburse Seller for the amount of such excess at the time it is so transferred. Seller shall use its best efforts in dealing with its actuaries and the appropriate regulatory authority to minimize the amount of such excess.

(*Id.* at para. 3.2.f; Plaintiffs' Ex. 118 at p. 18.)

Among the applicable law encompassed by paragraph 3.2.f was Code § 414(*l*), which required that a trust have sufficient assets to fund the present value of accrued benefits under the plan calculated on an ongoing basis as a condition for qualification under § 401. If the Gulf Plan assets calculated under paragraph 3.2.e of the Asset Purchase Agreement were not sufficient to satisfy the requirements of § 414(*l*), Chevron, as Seller, agreed in paragraph 3.2.f to require the Gulf Pension Plan to transfer additional Plan assets to Cumberland Farms, and Cumberland Farms agreed to reimburse Chevron for such excess payments.

Chevron intentionally designed the actuarial assumptions upon which the initial transfer of Gulf Plan assets was to be calculated so there would not be a sufficient transfer of assets to satisfy Code § 414(*l*). Although Chevron knew that many Gulf employees would elect to take

---

**62.** The parties have agreed to this rate and period of compounding, and it is consistent with the rate of interest the Plan could have earned on this money had it remained in the Plan.

early retirement under Cumberland Farms' plan, especially undiscounted early retirement at age 62, the actuarial assumptions drafted by Chevron assumed that no former Gulf employees would retire early. The agreed actuarial assumptions to the Cumberland Farms Asset Purchase Agreement assumed that no Gulf employees would retire early, even though paragraph 3.2.d(3) and (4) of the same Agreement expressly required that Cumberland Farms' plan allow Gulf employees to take undiscounted early retirement at age 62 and discounted early retirement before age 62. (Plaintiffs' Ex. 118 at pp. 13–14 and Appendix 10, paragraph (5)) This anomaly was not an oversight. Chevron Assistant Comptroller R.G. Williamson instructed PM & S attorney William B. Berry, who drafted the Cumberland Farms Agreement, to include this provision in the actuarial assumptions of asset purchase agreements and also to include payback procedures in these agreements.[63] Both Williamson and Berry testified that they knew the early retirement assumption was incorrect and would probably necessitate additional transfers from the Gulf Pension Plan to the buyer when the later § 414(*l*) calculations were required to be made.

The motivation for this negotiating posture was Chevron's desire to maximize its ultimate gain from divestitures by taking advantage of the overfunded status of the Gulf Pension Plan. As outlined in Plaintiffs' Ex. 51, a May 8, 1984, memo from Chevron Comptroller G.K. Carter to Chevron Vice–President J.N. Sullivan:

> A brief review of the Gulf pension plan shows it to be substantially overfunded. This has occurred for two primary reasons: (1) strong financial market performance the past two years, significantly increasing the market value of fund assets; (2) actuarial funding methods such as that used by Gulf traditionally overfund during earlier career years

> compared to pension benefits actually accrued. It is important that the company capture this overfunding either in the form of a higher purchase price to the buyer or retention of the excess funding by the Gulf plan (which ultimately can be used by Chevron).

After the Cumberland Farms divestiture, in return for requiring the Gulf Pension Plan to transfer assets to Cumberland Farms that would satisfy Code § 414(*l*), Chevron received an $8,272,566 promissory note from Cumberland Farms.[64]

Section 406(b)(1) of ERISA, 29 U.S.C. § 1106(b)(1), prohibits a plan fiduciary from dealing with plan assets in its own interest or for its own account, and § 406(b)(3) of ERISA, 29 U.S.C. § 1106(b)(3), forbids a plan fiduciary from receiving any consideration for the fiduciary's own account from any party dealing with the plan in connection with a transaction involving plan assets. A transaction prohibited by § 406 is *per se* illegal regardless of whether the plan suffers an injury or the fiduciary profits from the transaction. *Donovan v. Cunningham*, 716 F.2d 1455, 1464–65 (5th Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 889 (1984); *Leib v. Commissioner*, 88 T.C. 1474, 1480–81 (1987). In addition, § 409(a) of ERISA, 29 U.S.C. § 1109(a), requires a fiduciary who breaches a fiduciary obligation of ERISA to restore to the plan any losses resulting from the breach.

When Chevron negotiated and benefited from the Cumberland Farms Asset Purchase Agreement, it was a fiduciary of the Gulf Pension Plan, and the Agreement negotiated by Chevron was a transaction involving Gulf Plan assets. In negotiating the Agreement Chevron used its fiduciary status to obtain a *quid pro quo* for its own corporate benefit.

---

**63.** See August 3, 1984, and September 20, 1984, memoranda from Williamson to Berry; Plaintiffs' Ex. 93, at para. 3 and Plaintiffs' Ex. 95, at para. 3.

**64.** The Asset Sales Agreement with Champion Energy would have resulted in the receipt by Chevron of a payback of approximately $972,699. That agreement was amended in February of 1988, however, to cancel the provision requiring a transfer of assets from the Gulf Pension Plan to Champion.

Chevron attempts to justify this payback procedure as "exclusively a business arrangement that did not implicate [its] fiduciary duties" (Defendants' Proposed Finding of Fact 3.58). The Court disagrees. The principal authority relied upon by Chevron, *Sutton v. Weirton Steel Div. of National Steel Corp.*, 567 F.Supp. 1184, 1200–01 (N.D.W.Va.), *aff'd*, 724 F.2d 406 (4th Cir.1983), *cert. denied*, 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984), does not sanction the conduct of Chevron in this case. *Sutton* recognizes that there is nothing in ERISA that expressly prohibits an employer, which is naturally interested in reducing costs, from also acting as the administrator or trustee of a pension plan. The language of the *Sutton* opinion upon which defendants rely states:

> However, it is the Court's opinion here that when a corporate employer negotiates the terms of sale of a division, whose employees are participants in a pension plan, the negotiations that affect the terms and conditions of future pension benefits (at least those that are not protected by ERISA's vesting and nonforfeitability provisions), do not implicate fiduciary duties as to the pension fund. *Such negotiations are distinct from actually administering a plan and conducting transactions affecting the monies and property of the plan's fund.*

567 F.Supp. at 1201. (emphasis added)

This case is easily distinguishable from *Sutton* and the other authorities cited by defendants because Chevron did more than merely negotiate a sale of assets to Cumberland Farms with resultant effects upon future pension benefits of transferring Gulf employees. Chevron's negotiations with Cumberland Farms also resulted in the payment of substantial funds from the Gulf Pension Plan to the Cumberland Farms' plan with a dollar-for-dollar payback, not to the Gulf Pension Plan, but to Chevron. The Court asked every Chevron witness who testified about this transaction why the Cumberland Farms Asset Purchase Agreement was not structured to provide for reimbursement to the Gulf Pension Plan, instead of Chevron, should additional asset transfers be required to satisfy

Code § 414(*l*). The only answer the Court received was the tautological statement that it was a negotiated business transaction.

The fiduciary duty imposed by ERISA encompasses both a duty of loyalty and a duty of care. As this Court explained in *Wright v. Nimmons*, 641 F.Supp. 1391 (S.D.Tex.1986):

> The duty of loyalty ... is commonly expressed in the form of a prohibitive rule. In short, a fiduciary *must not* treat the trust *res* as if it were his own property; the fiduciary must not abuse his position of trust in order to advance his own selfish interests. On the other hand, the duty of due care ... is commonly expressed affirmatively. The fiduciary, therefore, must exercise at least that degree of care that a reasonably prudent person would devote to his own affairs under like circumstances. In short, a fiduciary *must* treat the trust *res* as if it were his own property; the fiduciary must exercise his position of trust so that the beneficiary of the trust is not harmed as a consequence of his failure to exercise reasonable care.

*Id.* at 1402. (emphasis in original) In scrutinizing this transaction under the fiduciary lens of ERISA, the Court must look at the intent, rather than the form, of what was done. *See* 1 J. Pomeroy, EQUITY JURISPRUDENCE § 378 (4th ed. 1918). Here, as in *Wright*, the Court concludes that Chevron, as a fiduciary of the Gulf Pension Plan, breached its duty of loyalty by treating the Gulf Pension Plan Trust as if it were Chevron's property. In doing so, Chevron violated § 406(b)(1) and (3) of ERISA. To remedy this fiduciary breach, the Court will order that Chevron pay $8,272,566 to the Chevron Retirement Plan, to be held in trust for the use and benefit of class members who are beneficiaries of the Gulf Pension Plan. Because Chevron, rather than the Plan, has had the use and benefit of this money, the Court in the exercise of its equitable discretion will also order that Chevron pay prejudgment inter-

est on this amount at the rate of 10%, compounded annually.[65]

The Court is not persuaded by plaintiffs' argument that a constructive trust should be established in favor of former Gulf Pension Plan members to be used exclusively to provide them with *additional* benefits beyond their benefits under the Gulf Plan. In the principal authority cited by plaintiffs to support such relief, *Amalgamated Clothing & Textile Workers Union v. Murdock*, 861 F.2d 1406, 1411–12 (9th Cir.1988), all of the plan participants and beneficiaries had been paid their actuarially vested benefits. Thousands of former Gulf Pension Plan participants, however, have not yet retired and thousands of those who have retired are still receiving Plan benefits. The Court's remedy will require Chevron to restore to the Chevron Retirement Plan the consideration that Chevron received from its fiduciary breach. Plaintiffs' concern that Chevron might some day receive this money back by terminating the Chevron Retirement Plan and receiving any plan surplus is conjectural at this point. Furthermore, the Court's remedy will have sufficient deterrent effect to satisfy the purposes of § 409(a) of ERISA. Chevron's reimbursement will not be a tax-deductible contribution under ERISA, but a reimbursement for funds improperly diverted from the Gulf Plan, and any future reversion of such funds by Chevron will be subject to the federal excise tax on employer reversions.

### C. *SRAP*

In response to the decline in oil prices that began late in 1985, Chevron adopted the Special Retirement Allowance Program ("SRAP") effective July 7, 1986. SRAP was a window program designed to encourage early retirement. Eligible employees received SRAP benefits in addition to their normal accrued pension benefits under the then merged Chevron Retirement Plan. SRAP benefits were available to all employees in eligible positions who met certain age and service requirements if they

voluntarily retired between July 7, 1986, and November 30, 1986, and to all employees with one or more years of service who were involuntarily terminated for reasons other than cause during this period.

Employees who received SRAP benefits were entitled to the greater of: (1) a recalculated benefit taking into consideration four additional years of age and four additional years of credited service, or (2) a minimum enhancement, in the form of a lump-sum benefit, of the employee's highest average earnings over a period of two-to-ten months, depending upon the employee's length of service with Gulf or Chevron. Employees who were not eligible for an early retirement benefit under the Chevron Plan after this additional crediting of age and service received an accrued benefit, including the enhancement, which was calculated using the Chevron Retirement Plan's early retirement factor (5% per year reductions from age 62). The entire benefit, including the enhancement, was available to employees in either a lump-sum or an annuity, regardless of the employee's age. Approximately 2,908 former Chevron employees and 929 former Gulf employees received SRAP benefits.

Plaintiffs allege that by paying a disproportionate amount of SRAP benefits to former Chevron employees who had never been members of the Gulf Pension Plan, Chevron breached its fiduciary duty to former Gulf Plan members and violated provisions of the Gulf Pension Plan and the Master Trust dealing with contributions to the CRP and SAP. Section 8.A of the Gulf Pension Plan stated:

> All contributions made by a member to [the CRP and/or SAP] shall continue to be held in trust under this Plan until such time as they are used for the exclusive benefit of the member or the member's joint pensioner or beneficiary. (Plaintiffs' Ex. 29 at p. 36)

Section 2.6 of the Master Trust in effect at the time of the July 1, 1986, plan merger stated:

---

**65.** The parties have agreed to this rate and period of compounding, and it is consistent with the

rate of return that Chevron received on the Cumberland Farms payback.

... [A]t no time prior to the satisfaction of all liabilities for benefits under any such Plan shall any part of the Trust be used for or diverted to purposes other than the exclusive benefit of participants, retired participants or beneficiaries under each Plan, and for the payment of expenses of each Plan. (Plaintiffs' Ex. 393)

Furthermore, as discussed in part III.A, *supra*, the CRP and SAP trust agreements and the 1979 Master Trust Agreement prohibited use of CRP or SAP assets for benefits and liabilities not provided by those plans.

 As a factual matter, however, plaintiffs have failed to prove that SRAP benefits were paid from CRP or SAP assets. There was no evidence of which trust assets these benefits were paid from; SRAP benefits could just as likely have been paid from the surplus attributable to the A & B component of the Gulf Pension Plan trust or from the surplus attributable to the former Chevron Annuity Plan.[66] Furthermore, since the Court will require that all CRP and SAP assets be segregated from the Chevron Retirement Plan as of June 30, 1986, and distributed to participants in the CRP and SAP, even had plaintiffs been able to trace any part of the SRAP benefits to the CRP or SAP component of the Chevron Retirement Plan trust, plaintiffs would still be unable to show any injury.

 Nor does the Court conclude that Chevron breached any fiduciary duty by paying SRAP benefits from the assets of the merged Chevron Retirement Plan. Any economic benefit that Chevron derived from the manpower reductions that resulted from implementing SRAP did not violate ERISA's exclusive benefit rule, § 403(c)(1) of ERISA, 29 U.S.C. § 1103(c)(1). This rule states that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the

plan." However, the rule does not prohibit implementation of SRAP merely because it provided an indirect benefit to Chevron.

The exclusive benefit rule prohibits an employer from using plan funds for the direct, primary benefit of the employer. The rule "cannot be read as a prohibition against any decisions of an employer with respect to a pension plan which have the obvious primary purpose and effect of benefiting the employees, and in addition the incidental side effect of being prudent from the employer's economic perspective." *Holliday v. Xerox Corp.*, 732 F.2d 548, 551 (6th Cir.), *cert. denied*, 469 U.S. 917, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984); *see Bass v. Retirement Plan of Conoco, Inc.*, 676 F.Supp. 735, 748–49 (W.D.La.1988) (upholding validity of employer's implementation of an early retirement program after Conoco sold plaintiffs' division despite plaintiffs' claims that Conoco benefited from the work force reduction and that current Conoco employees received benefits that plaintiffs did not receive). Because the Court finds that the benefits Chevron received from implementing SRAP were incidental to the primary purpose of providing early retirement benefits to Chevron employees, the Court concludes that SRAP was not a breach of Chevron's fiduciary duties to former Gulf Plan members.

### D. *AVIS*

To partially offset the effects of inflation after the July 1, 1986, plan merger, Chevron paid Annuitant's Voluntary Income Supplements ("AVIS") to employees who had retired under the Gulf Pension Plan, the Chevron Annuity Plan, and Chevron Retirement Plan. Before the July 1, 1986, plan merger, Gulf had paid AVIS-type supplements from the Gulf Plan, but Chevron had paid AVIS supplements out of its corporate till. After the plan merger Chevron adopted the Gulf approach and paid all AVIS benefits from the newly merged plan. Plaintiffs level the same objections to the AVIS payments that they do to SRAP benefits.

---

**66.** Likewise, there was no evidence that SRAP benefits were paid from the sub-set of CRP and

SAP assets comprising member contributions that is addressed in § 8.A of the Gulf Plan.

The Court finds that plaintiffs have failed to prove that any AVIS payments were paid from CRP or SAP assets. Likewise, the Court concludes that plaintiffs have failed to show that Chevron violated the exclusive benefit rule by making AVIS payments from plan, rather than corporate, assets. *See Van Orman v. American Insurance Co.*, 608 F.Supp. 13, 24 (D.N.J.1984) (employer's use of surplus assets attributable to employee contributions to reduce employer's own plan contributions instead of providing participants with increased benefits was a permissible exercise of the employer's business judgment and did not violate the employer's fiduciary obligations).

### E. Defendants' Promises to Set Aside Gulf Plan Assets for Plaintiffs' Benefit

Plaintiffs allege that Chevron promised orally and through correspondence with plaintiffs (e.g., Plaintiffs' Exs. 1 and 620) and through company newspapers (Plaintiffs' Ex. 494) to set aside part of the Gulf Plan assets to provide reserves sufficient to secure benefits in the event that the Gulf Plan were ever merged with the Chevron Annuity Plan. Because no reserves were set aside, plaintiffs allege that Chevron breached its duty of loyalty under § 404(a) of ERISA, 29 U.S.C. § 1104(a) and common law. To cure these breaches, plaintiffs request the equitable remedy of specific performance.[67]

While no specific reserves were ever established, plaintiffs' expert, Mr. Dreher, testified that the merged Chevron Retirement Plan has a surplus in excess of accrued benefits of more than $800 million and that this surplus is likely to remain above the full funding limit for a considerable time. Furthermore, § 16(c) of the Chevron Retirement Plan (Defendants' Ex. 21) obligates Chevron to cause the participating companies to contribute to the plan each year an amount necessary to satisfy minimum funding standards for that year.

Although Chevron made the promises alleged by plaintiffs and did not establish a specific reserve for Gulf Plan members, the Court concludes that plaintiffs cannot prevail on this claim for several reasons. First, these promises were not contained in a written plan document as required by § 402(a)(1) of ERISA, 29 U.S.C. § 1102(a)(1). Plaintiffs admit that the writings that contained these representations were not plan documents. (Plaintiffs' Post–Argument Brief on Defendants' Promise to Set Aside Plan Assets for Plaintiffs' Benefit at p. 4) Since these claims do not arise out of an ERISA plan, they are not actionable under ERISA. *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1296–97 (5th Cir.1989); *Degan v. Ford Motor Co.*, 869 F.2d 889, 895 (5th Cir.1989).

The mere fact that some of these representations were made in writing does not lead to a different result; the test is whether the claim is based on plan documents, not whether non-plan representations were oral or written. In *Alday v. Container Corp. of America*, 906 F.2d 660 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991), the plan documents allowed the administrator to "terminate, suspend, withdraw, amend or modify the Plan in whole or part at any time." 906 F.2d at 662. Forms and correspondence sent to individual plan members stated that health insurance was available to members and their dependents upon retirement at a modest cost. When the employer later amended the plan to modify these benefits and substantially raise employee contributions for retiree health benefits, the plaintiff class alleged that the employer had breached its fiduciary duty under ERISA and was promissorily estopped from rescinding the representations contained in these non-plan written commu-

---

**67.** Originally this argument also focused on the diversion of Gulf Plan assets to pay SRAP and AVIS benefits. That portion of the argument has been addressed separately in parts V.C. and D. above. Furthermore, to the extent that plaintiffs' argument subsumes within it Chevron's use of CRP and SAP trust assets to satisfy other Chevron Retirement Plan obligations, that argument is addressed in parts V.C. and D., and any conceivable injury has been remedied by the relief provided in part IV and the Final Judgment.

nications. In affirming the trial court's summary judgment for the defendants, the Eleventh Circuit held that, notwithstanding that the employer communications were in writing, they were not plan documents under § 402(a) of ERISA, and therefore the employer did not breach its fiduciary duty in disregarding such communications and relying instead on ERISA documents. Plaintiffs' promissory estoppel claim does not fare any better because it is well established that ERISA preempts common law promissory estoppel claims. *Degan*, 869 F.2d at 895; *Alday*, 906 F.2d at 664–65.

■ Furthermore, even were plaintiffs' fiduciary and estoppel claims actionable, plaintiffs have not shown that they have suffered any injury that would create a ripe controversy in either the jurisdictional or prudential sense. Although a separate reserve for Gulf Plan benefits was not established, the Chevron Retirement Plan from which benefits are to be paid is substantially overfunded and will be for some time according to plaintiffs' own expert. Plaintiffs' benefits are further guaranteed by Chevron. The Court concludes that plaintiffs have therefore failed to show that the challenged action of defendants will have any direct and immediate impact on them that would warrant judicial consideration at this time. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524–25, 18 L.Ed.2d 697 (1967). Similarly, with respect to their promissory estoppel claim, plaintiffs have not established either that they relied detrimentally on defendants' representations or if they did so, that they have suffered any cognizable harm.

### F. *Other Alleged Fiduciary Breaches*

■ Plaintiffs allege that because Pillsbury, Madison & Sutro, the outside law

firm that provided legal advice to the Gulf Plan fiduciaries after February of 1984, also had a long-standing and close relationship with Chevron, the Gulf Pension Plan Benefits Committee and Chevron should have retained separate law firms to represent their interests with respect to the plan merger. Plaintiffs have cited no authority for this proposition,[68] and defendants have presented a case that refutes it. *Ashenbaugh v. Crucible, Inc. 1975 Salaried Retirement Plan*, 854 F.2d 1516 (3d Cir.1988), *cert. denied*, 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1019 (1989). In their Post–Trial Brief on Chevron's Fiduciary Breaches, plaintiffs appear to retreat from their initial argument on this alleged fiduciary breach and to argue instead that the Court should not give deference to the defendants' interpretations or actions because of the inherent conflict by the outside counsel who either carried out or advised plan fiduciaries concerning those interpretations and actions. As reflected by the preceding parts of this Opinion, the Court has evaluated the weight and credibility to be given to the actions and interpretations of defendants and their attorneys. To the extent that plaintiffs seek other, independent, relief because of the joint representation of Pillsbury, Madison & Sutro, their request for relief is denied.

The Court has considered other fiduciary breaches alleged by plaintiffs in various places in the Joint Pretrial Order, trial briefs, proposed findings of fact, and numerous post-trial briefs. To the extent they have not been expressly addressed in this Opinion, the Court finds that those allegations are not legally or factually supportable and denies any relief based upon them.

### VI. CONCLUSION

1. The significant corporate event that occurred between January 1, 1984, and

---

**68.** The closest authority cited by plaintiffs, *Donovan v. Bierwirth*, 680 F.2d 263, 273 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982), is fact determinative, and merely suggests that in some situations it may be a good idea for a plan to retain independent

counsel. The Court does not quarrel with that advice, but declines to hold as a general proposition that independent counsel must be obtained in order to satisfy a fiduciary's duty of care or loyalty.

June 30, 1986, resulted in a vertical partial termination of the Gulf Pension Plan.

2. A horizontal partial termination of the Gulf Pension Plan occurred as a result of the reduction in future benefit accruals from the merger of the Gulf Pension Plan into the Chevron Retirement Plan on July 1, 1986, and all members of the class employed by Chevron on that date will be vested in all Gulf Pension Plan benefits accrued as of that date.

3. Defendants' denials of plaintiffs' claims to surplus CRP and SAP assets were an abuse of discretion. However, defendants' refusal to pay surplus CRP and SAP assets to plan participants prior to complete terminations of the plans was not an abuse of discretion.

4. Because the CRP and SAP trusts were wasting trusts on June 30, 1986, the day before the CRP and SAP were merged into the Chevron Retirement Plan, all CRP and SAP assets and liabilities will be spun-off from the Chevron Retirement Plan effective June 30, 1986, and segregated in separate trusts.

5. Defendants abused their discretion in paying the expenses of outside investment managers from the Gulf Pension Plan from January 1, 1982, through June 30, 1986, and have thereby caused damage to the Gulf Pension Plan of $15,225,000, plus pre-judgment interest at the rate of 10% compounded annually.

6. Chevron, as a fiduciary under the Gulf Pension Plan, breached its fiduciary duty by requiring that the Cumberland Farms Asset Purchase Agreement contain a pay-back provision to Chevron, and has thereby caused damage to the Gulf Pension Plan of $8,272,566, plus pre-judgment interest at the rate of 10% compounded annually.

7. Chevron's payment of SRAP benefits did not breach its fiduciary duty or violate the provisions of the Gulf Pension Plan or the Master Trust.

8. Chevron's payment of AVIS benefits did not breach its fiduciary duty or violate the provisions of the Gulf Pension Plan or the Master Trust.

9. Defendants' failure to set aside a part of the Gulf Plan assets as reserves to secure benefits under the Gulf Pension Plan did not violate their duty of loyalty under ERISA or common law.

10. To the extent not expressly addressed in this Opinion, all other claims and relief sought by plaintiffs are denied.

### FINAL JUDGMENT

In accordance with the Court's Opinion, the Court ORDERS, ADJUDGES and DECREES that:

1. All members of the class who were employed by Chevron Corporation on July 1, 1986, are vested in all Gulf Pension Plan benefits accrued as of that date.

2. Chevron Corporation shall pay to the Chevron Retirement Plan, to be held in trust for the use and benefit of class members who are beneficiaries of the Gulf Pension Plan, $23,497,566, together with pre-judgment interest at the rate of 10% compounded annually, and post-judgment interest at the rate of 6.26%.

3. The assets and liabilities of the Contributory Retirement Plan of Gulf Oil Corporation ("CRP") and the Supplemental Annuity Plan of Mene Grande Oil Company ("SAP") shall be spun off from the other assets and liabilities of the Chevron Retirement Plan as soon as practicable following the date of this Judgment, and segregated in separate trusts according to the following terms:

(a) The assets of the CRP and SAP to be spun off shall include all assets in the trusts (or sub trusts) for the plans as of June 30, 1986, adjusted for all actual trust fund earnings and distributions to participants and beneficiaries of the plans since then;

(b) The amount of assets and liabilities spun off shall be subject to the final approval of Chevron's independent enrolled actuary and Mr. William A. Dreher, who is appointed to serve as enrolled actuary for the spun-off plans. Any disputes between the actuaries will be resolved by the Court. The spun-off assets shall be segregated,

liquidated as necessary and prudent, and invested in temporary investments under the supervision of class counsel pending the appointment of a trustee and pending termination of the CRP and SAP and distribution of their assets;

(c) Chevron Corporation will take all necessary ministerial steps to accomplish the spin-offs including (1) the filing of the appropriate advance notification with the Internal Revenue Service as soon as reasonably practicable, and (2) the execution of appropriate amendments to the Chevron Retirement Plan, which shall be submitted in advance to plaintiffs' counsel for comments and to the Court for advance approval. The amendments shall reflect the separateness of the CRP and SAP and shall reflect that no employer reversion of CRP or SAP assets is possible, and that, in the event of plan termination, all assets of the CRP and SAP shall be allocated to participants and beneficiaries in accordance with this Judgment. Chevron Corporation shall submit the approved amendments to the IRS and PBGC for approval when it submits the information pursuant to paragraph (e) below;

(d) Section 18.d of the Chevron Retirement Plan is void *ab initio* and shall be treated as such to the extent that it purports to allow a reversion of CRP and SAP assets to Chevron Corporation;

(e) The CRP and SAP shall be terminated and the assets in their separate trusts distributed as soon as reasonably practicable following the spin-offs of the plans. Chevron Corporation will take all ministerial steps necessary to accomplish such termination, including advance notification of participants, the IRS and the PBGC. Chevron Corporation may choose the exact date of termination, but that date shall be no later than six months after the date of this Judgment;

(f) Class members eligible to share in the allocation of surplus assets ("distributees") shall include all members of the

main class defined by the Court who were members or beneficiaries of the CRP or SAP;

(g) Allocation of assets among distributees shall be done in accordance with the procedure outlined in the draft of Appendix A to this Judgment;

(h) Distributees may elect to receive their allocable share of plan assets in any of the forms otherwise available pursuant to the Chevron Retirement Plan, subject to any applicable requirements of a spousal consent or qualified domestic relations order;

(i) Any benefits payable in an annuity form shall be provided through annuities purchased from one or more insurance companies selected pursuant to the procedure in Appendix A;

(j) Allocation of assets shall be subject to the approval of Mr. Dreher;

(k) The termination of the CRP and SAP and their trusts and the distribution of their assets shall be submitted to the IRS and PBGC under joint supervision of counsel for plaintiffs and counsel for defendants;

(*l*) After the spin-off and termination of the CRP and SAP, no further CRP or SAP benefit accruals will be payable from the Chevron Retirement Plan. The Chevron Retirement Plan may be amended to delete the contributory allowance in its entirety and CRP and SAP annuitants will not be eligible for voluntary AVIS supplements, which may be granted to the other Chevron Retirement Plan beneficiaries. Future salary increases of active CRP and SAP plan participants after the termination of the CRP and SAP will no longer affect the value of CRP or SAP benefit accruals;

(m) Defendants will designate class counsel as persons having power of attorney in connection with matters involving the IRS and PBGC, and will designate them to receive copies of any communications with or by the agencies on any matter concerning the spin-off, termination and distribution of assets of the CRP and SAP. The Court

shall retain jurisdiction to resolve any objections raised by the PBGC or IRS that cannot be resolved by agreement among the parties;

(n) Each party will pay its own expenses in connection with the spin-off and termination of the CRP and SAP. Expenses of Mr. Dreher incurred pursuant to this Judgment will be paid from CRP and SAP assets;

(o) The parties will meet within 5 business days from the entry of this Judgment to agree upon the timing and any proposed modifications of Appendix A. If the parties agree, they will forward an executed copy of the final version of Appendix A to the Court by April 25, 1991, for approval. If the parties cannot agree on the timing or details of these procedures, (1) the Court will conduct a hearing on May 2, 1991, at 2:00 p.m., and (2) no later than April 25, 1991, each side will provide the Court with its proposed version of Appendix A, together with an explanation of why its proposal is more reasonable than that of its opponents.

4. The Court will maintain jurisdiction over this action to ensure compliance with the relief ordered in paragraph 3 of this Judgment and to determine whether plaintiffs' counsel are entitled to additional attorneys' fees and expenses, and if so, the reasonable and necessary amount of such fees and expenditures.

This is a FINAL JUDGMENT.

## APPENDIX A

PROCEDURE FOR UNMERGING CRP AND SAP FROM CHEVRON RETIREMENT PLAN, TERMINATING THE CRP AND DISTRIBUTING ASSETS TO PLAN MEMBERS AND BENEFICIARIES

I. ESTABLISH CURRENT MARKET VALUE OF CRP AND SAP ASSETS BY _____.

 A. Obtain records from last Chevron/Bankers Trust accounting.

 B. Obtain any updates from Chevron/Bankers Trust.

 C. Actuaries to review Chevron/Bankers Trust records and make any corrections or changes necessary.

 D. Conduct audit to review income and pay-outs from trust funds, and establish market value of CRP and SAP trust assets as of date of Final Judgment.

II. ESTABLISH SEPARATE TRUST ACCOUNTS BY _____.

 A. Within ____ days of the Final Judgment, actuaries to provide Chevron with certification of compliance with IRC § 401(a)(12), and regulations under § 414(1), required by Form 5310.

 B. Within ____ days of the Final Judgment Chevron to file Form 5310 with IRS for Chevron Retirement Plan, CRP and SAP.

 C. Plaintiffs to draft separate trust instruments and submit to defendants for comments.

 D. Plaintiffs to submit names of trustee(s) of separate CRP and SAP trusts to defendants for comments and input.

 E. Court approval of trust instruments and trustee(s).

 F. Transfer cash from Chevron Master Trust to separate CRP and SAP trusts.

 G. Invest cash in short-term, high-quality liquid assets.

III. TERMINATION OF CRP AND SAP UNDER § 4041 OF ERISA AND IRS APPROVAL.

 A. Chevron to notify CRP and SAP participants and beneficiaries 60 days before termination date.

 1. Notice to each participant to contain information required by ERISA § 4041(b)(2)(B) (amount of benefit, form of benefit, basis for calculating benefit, etc.).

 B. Chevron to file PBGC Form 500 (Notice of Intent to Terminate) as soon as practicable after giving notice.

 1. Actuaries to provide Chevron with PBGC Schedule EA–S.

 C. Chevron to file Form 5310 seeking IRS approval of termination at same time as filing Form 500.

D. Chevron will choose the date of termination, but the date will be no later than six months after the entry of Final Judgment, and no earlier than 60 days after Chevron notifies participants of intent to terminate.

IV. ACTUARIAL VALUATION OF CRP AND SAP PLAN LIABILITIES ON TERMINATION BASIS AS OF TERMINATION DATE BY _____.

A. Mr. Dreher will obtain all relevant information concerning participants and beneficiaries (age, sex, salary, service dates, employee numbers, benefit amounts, etc.) from defendants and/or Chevron's actuaries.

B. Mr. Dreher will submit proposed assumptions to parties for comments and approval.

C. Mr. Dreher will confirm benefit entitlement of each CRP and SAP participant and beneficiary (using data from defendants and Chevron's actuaries, benefit calculation worksheets, etc.).

D. Mr. Dreher will calculate plan liabilities on termination basis as of date of termination.

E. Mr. Dreher will submit to the parties for comments and to the Court for approval, if necessary, a report showing termination basis liabilities, value of trust assets and amount of surplus.

V. ALLOCATION OF SURPLUS.

A. Allocate surplus among all members of the class who were members in or beneficiaries of the CRP and SAP, including all former participants whose pension benefits were transferred to the pension plan established by Sohio or Cumberland Farms in connection with those divestitures.

B. Specific methods of allocating surplus to various groups.

1. Generally, the fraction of the surplus to be allocated and distributed to each of the participants and beneficiaries shall be calculated by dividing the single sum value of the CRP or SAP accrued benefit ("share basis") of each class member by the single sum value of all such accrued benefits.

2. "Share basis" for former participants whose benefits were transferred to either Sohio or Cumberland Farms pension plans, or who left the Gulf Plan prior to date of termination of the CRP or SAP, shall be based upon their accrued benefits as of the date of their termination of employment from Gulf or Chevron.

3. For all participants who were active employees as of June 30, 1986, and remain active on CRP or SAP termination date, the share basis will be based upon their accrued benefit as of the date of CRP/SAP termination.

VI. DISTRIBUTE BENEFITS AND SURPLUS BY _____.

A. Plaintiffs' counsel will notify participants and beneficiaries of approximate amounts due them and their payment options.

1. Annuities.
 a. Period certain.
 b. Joint and survivor.
 c. Combinations of the above.

2. Lump sum for those who were active on or after July 1, 1986.

B. Plaintiffs' counsel will tabulate responses from participants and beneficiaries.

C. Plaintiffs' counsel or trustee(s) will appoint consultant for annuities and develop bid specifications.

D. Plaintiffs' counsel or trustee(s) will invites bids from financially strong insurance and annuity companies.

E. Consultant will evaluate bids and recommend winning bidder(s), subject to Court approval.

F. Plaintiffs' counsel, Mr. Dreher and trustee(s) will prepare final list of benefit and surplus amounts for each participant or beneficiary.

G. Submit distribution plan to Court for final approval.

H. Transfer assets to annuity underwriters (reserving some funds for administrative expenses).

I. Mr. Dreher will confirm calculations of annuity underwriters.

J. Distribute lump-sum amounts.

K. Plaintiffs' counsel to review and finalize annuity contracts.

L. Distribute annuity certificates to participants and beneficiaries.

M. Distribute IRS 1099 forms.

N. Mr. Dreher will inform Chevron of CRP and SAP benefits.

O. Chevron may not offset any surplus amounts received by participants from non-contributory benefits otherwise due under Chevron Retirement Plan.

VII. PREPARE FINAL REPORT OF ASSET DISTRIBUTION FOR COURT (JOINT EFFORT BY COUNSEL, TRUSTEE(S), ACTUARIES AND ANY CONSULTANTS) BY _____.